UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


WAI FENG TRADING CO. LTD, and      :
EFF MANUFACTORY CO., LTD.,      :
       Plaintiffs,      :
       :
       v.      :      C.A. No. 13-033WES
       :
QUICK FITTING, INC.,      :
       Defendant.      :


       <u>Consolidated with</u>


QUICK FITTING, INC.,      :
       Plaintiff,      :
       :
       v.      :      C.A. No. 13-056WES
       :
WAI FENG TRADING CO., LTD.,      :
EASTERN FOUNDRY & FITTINGS, INC.,      :
EASTERN FOUNDRY AND FITTINGS, LLC,      :
NINGO EFF MANUFACTORY CO, LTD.,      :
f/k/a/ NINGO W&F MANUFACTORY CO., LTD.,:
WAI MAO COMPANY, LTD.,      :
CIXI CITY WAI FENG BALL VALVE      :
COMPANY, LTD.,      :
W&F MANUFACTURING, and      :
CHI YAM "ANDREW" YUNG,      :
       Defendants.      :


# REPORT AND RECOMMENDATION

PATRICIA A. SULLIVAN, United States Magistrate Judge.

       The commercial dispute framed by these contentiously litigated cases[1] has finally cleared

the discovery hurdles and reached the summary judgment phase, though not without significant

---

[1] Since they were filed in 2013, these cases have been the subject of many judicial decisions. <u>See, e.g.</u>, <u>Wai Feng Trading Co. Ltd v. Quick Fitting, Inc.</u>, C.A. No. 13-33S, 2016 WL 4184014 (D.R.I. June 14, 2016); <u>Quick Fitting, Inc. v. Wai Feng Trading Co. Ltd.</u>, Civil Action No. 13-56S, 2015 WL 5775108 (D.R.I. June 17, 2015), <u>adopted</u>, No. CA 13-056 S, 2015 WL 5775149 (D.R.I. Sept. 30, 2015); <u>Quick Fitting, Inc. v. Wai Feng Trading Co., Ltd.</u>, No. CA 13-56S, 2015 WL 5719503 (D.R.I. Feb. 27, 2015), <u>adopted</u>, Civil Action No. 13-056 S, 2015 WL 5719571 (D.R.I. Sept. 29, 2015); <u>Wai Feng Trading Co. Ltd. v. Quick Fitting, Inc.</u>, C.A. No. 13-033 S, 2014 WL 4199174 (D.R.I. Aug. 22, 2014). References to these decisions will be by citation, rather than by docket number.

bumps along the way.[2]  The first of the two cases (13-33) was initially filed in Canada, on

August 2, 2012, and was refiled in this Court on January 17, 2013.  As framed in the operative

pleading, the Fourth Amended Complaint, (ECF No. 80) ("13-33 complaint"), 13-33 is a simple

collection action, seeking to recover money for plumbing push-fit products sold, delivered and

accepted.  The second case – 13-56 – was filed on January 25, 2013.  As amended, its operative

pleading is the Second Amended Verified Complaint, (13-56 ECF No. 135)[3] ("13-56

complaint"), which counters the collection action with eleven Counts alleging, *inter alia,* breach

of various non-competition, confidentiality, non-solicitation and non-disclosure clauses in the

agreements between the parties, the misappropriation of trade secrets, the stealing of intellectual

property, defamation and the delivery of unmerchantable and defective goods.  Many (but not

all) of the claims in 13-56 are counterclaims in 13-33.  ECF No. 81 (Amended Counterclaim)

("13-33 counterclaims").  Ultimately, the cases were consolidated (without prejudice to

bifurcation for trial) on September 30, 2015.[4]  Unless otherwise indicated, all docket references

in this report and recommendation will be to 13-33, which the Court has designated as the lead

case.

---

[2] After considerable wrangling, fact discovery in these cases finally closed on April 15, 2016, with additional time to
complete specified discovery.  Wai Feng Trading, 2016 WL 4184014, at *7.  The Court held its first summary
judgment conference on April 10, 2017, and set a briefing schedule.  Text Order of May 18, 2017.  After briefing
began, the Court held a second conference and ordered the parties to start over, requiring them first to file the
undisputed and disputed facts and then to refile the summary judgment briefs once the factual record was settled.
Following a third conference, the deadlines were extended.  Text Orders of Aug. 16, Oct. 20 and Dec. 7, 2017.
Additional extensions were also granted.  Text Orders of Jan. 8, Jan. 24, Feb. 26 and Mar. 30, 2018.  The resulting
record – including not only the summary judgment record, but also the record for the related motions – is massive,
amounting to almost seven thousand pages of material.

[3] Quick Fitting moved to amend (13-56 ECF No. 178) its complaint after this iteration to add the verification, which
had been omitted.  That motion was granted by text order on February 23, 2016, but the amended pleading was
never filed, leaving 13-56 ECF No. 135 as the operative complaint.

[4] The cases were initially consolidated, then deconsolidated and eventually reconsolidated.  Quick Fitting, 2015 WL
5775149, at *1-3.

Now pending before the Court in each of the cases are six motions for summary judgment, five brought by the Wai Feng parties[5] and one brought by Quick Fitting,[6] as well as eight motions to strike brought by the Wai Feng parties and a motion seeking a finding of spoliation brought by Quick Fitting. All of the motions have been referred to me, some for determination, some for report and recommendation. 28 U.S.C. § 636(b)(1)(A)-(B).

---

[5] The "Wai Feng parties" include the plaintiffs in 13-33 and most of the defendants in 13-56. They are:

- Wai Feng Trading Co. Ltd. ("Wai Feng Trading"), a Canadian company, and its sometime alter ego, Eastern Foundry & Fittings, Inc. ("EFF Inc.");
- EFF Manufactory Co., Ltd. ("EFF Manufactory"), a Chinese company sometimes called Ningbo EFF Manufactory Co., Ltd. and Ningbo W&F Manufactory Co., Ltd.;
- Eastern Foundry & Fittings, LLC ("EFF LLC"), a Massachusetts limited liability company;
- Wai Mao Company, Ltd. ("Wai Mao"), a Canadian company; and
- Chi Yam Yung ("Andrew Yung"), an individual who resides in Canada and China.

EFF LLC, Wai Mao and Andrew Yung are defendants only in 13-56. In addition to the Wai Feng parties, several other defendants were named in 13-56 but are not parties. These are:

- W&F Manufacturing ("W&F Manufacturing") was held to be a trade name and not an entity subject to suit, ECF No. 132 at 13;
- Chi Pang Yung ("Jacky Yung"), a citizen of Canada and brother of Andrew Yung, was held not to be subject to personal jurisdiction in this District, Quick Fitting, 2015 WL 5719571, at *3-4;
- Jimmy Yung, the father of Andrew and Jacky Yung, was voluntarily dismissed, 13-56 ECF No. 93; and
- Cixi City Wai Feng Ball Valve Company, Ltd. ("CCWFBV"), later known as Ningbo Texoon Brass Works Co., Ltd., a Chinese company owned by an uncle of Andrew and Jacky Yung, was never served.

Mentioned by the parties, but not named as a party in either case, is a Chinese entity owned by a cousin of Andrew and Jacky Yung called Cixi Welday Plastic Products, Co., sometimes referred to as China Welday ("Cixi Welday").

In this report and recommendation, the shorthand names above will be used for each entity even though at various times the actual name of the entity may have been different.

The Court cautions the reader that the various entities constituting the Wai Feng parties and the other entities listed above not only have confoundingly similar names, exacerbated by name changes and alterations of corporate structure during the relevant period, but also were repeatedly misidentified in the pleadings and discovery produced in these cases. The resulting confusion has been an ongoing issue. See, e.g., Quick Fitting, 2015 WL 5719503, at *1-3 & nn.2, 6 ("While the Yung companies are responsible for the confusion caused by their use of similar names and by their repeated gaffes in misidentifying the appropriate entity, the Court is compelled to observe that Quick Fitting seems to have gone out of its way to exacerbate the confusion, perhaps to enhance its veil-piercing argument.").

[6] "Quick Fitting" is a Rhode Island corporation and is the defendant in 13-33 and the plaintiff in 13-56.

This report and recommendation addresses four of the pending summary judgment motions.[7]  Its principal focus is on the Wai Feng parties' motion for summary judgment challenging Count IV of Quick Fitting's 13-33 counterclaim and Count I of Quick Fitting's 13-56 complaint.  13-56 ECF No. 255.[8]  This motion calls into question the legal enforceability of three categories of challenged clauses contained in the three agreements[9] between various of the parties – a "Liquidated Damages/Contract Penalty" clause, several non-compete clauses and several non-solicitation/confidentiality clauses.  For the reasons that follow, I recommend that the Court grant this aspect of the motion because all the challenged clauses are unenforceable as a matter of law.  This motion also challenges the sufficiency of Quick Fitting's evidence of breach, including whether it has presented enough to prove damages.  I recommend that the Court deny this aspect of the motion because I find that the evidence is adequate for a trial regarding whether there was a breach of the unchallenged restrictive covenants in the Agreements, including whether Quick Fitting is entitled to actual or nominal damages based on any such breach.

---

[7] Not addressed in this report and recommendation is the Wai Feng parties' motion for judgment with respect to unpaid invoices for goods sold and delivered in excess of $400,000, as well as Quick Fitting's claims in 13-56 and counterclaims in 13-33 alleging that it was damaged because the goods covered by the invoices were unmerchantable and did not conform to the parties' agreement.  ECF No. 180; 13-56 ECF No. 254.  Nor does it address Quick Fitting's cross-motion for summary judgment based on its argument that, due to the Wai Feng parties' inter-company transfers and operational switch from Wai Feng Trading to EFF Inc., neither Wai Feng Trading, which issued the invoices, nor EFF Manufactory, which manufactured the product to fill the purchase orders and shipped the product to Quick Fitting, is entitled to recover.  13-56 ECF No. 259.  These matters will be addressed in a separate report and recommendation.  In addition, the various motions to strike and for a spoliation finding will be addressed separately.

[8] This motion was filed only in 13-56, instead of 13-33.  However, it also challenges the counterclaim in 13-33.

[9] The first of the three agreements in issue is the 2010 License and Supply Agreement ("2010 License/Supply Agreement").  WF Ex. 4.  The second is the 2011 Non-Disclosure Agreement ("2011 NDA").  WF Ex. 9.  The third is the 2011 License Agreement with Terms of Confidentiality, Non-Disclosure, and Non-Competition ("2011 License Agreement").  WF Ex. 11.  Collectively, they are referred to as the "Agreements."

The other three summary judgment motions addressed in the report and recommendation challenge the viability of Quick Fitting's claims against Andrew Yung in Count IX of the 13-56 complaint (13-56 ECF NO. 256) and against EFF LLC in all Counts of the 13-56 complaint (13-56 ECF No. 257), as well as the viability of Quick Fitting's claims in Counts II through VIII, X and XI in the 13-56 complaint (13-56 ECF No. 254). For the reasons that follow, I recommend that Andrew Yung's motion be denied, that EFF LLC's motion be granted and that judgment should enter in favor of the Wai Feng parties and against Quick Fitting as to the state law claims of defamation and fraud and misrepresentation, but be denied as to the claims based on the Rhode Island Uniform Trade Secrets Act (R.I. Gen. Laws § 6-41-1, *et seq*.), as well as the related claim of civil conspiracy, and be denied as to the claim for injunctive relief.

## I.    BACKGROUND[10]

---

[10] Throughout this report and recommendation, with pin cites to numbered paragraphs or page numbers as appropriate, the Court has used the following protocol for short hand references to the factual record. For citations to the facts and evidence marshaled by the Wai Feng parties, the following convention is used:

- WF SUF # 1………........... ECF No. 172;
- WF SUF # 2……………... ECF No. 176;
- WF SDF # 1……………… ECF No. 175; and
- WF Ex……………………. ECF No. 172-1 to 172-45.

The Wai Feng parties' supporting affidavits are among their exhibits and therefore are not separately listed.

For citation to the facts and evidence presented by Quick Fitting, the following convention is used:

- QF SUF # 1……………... ECF No. 173;
- QF SUF # 2……………... ECF No. 259-3 (13-56);
- QF SUF # 3……………... ECF No. 189-1;
- QF SDF # 1……………... ECF No. 177;
- QF SDF # 2……………... ECF No. 189-4;
- QF SDF # 3……………... ECF No. 210-1;
- QF Ex. # 1………………. ECF No. 178-1 to 178-32;
- QF Ex. # 2………………. ECF No. 259-4 to 259-31 (13-56);
- QF Ex. # 3………………. ECF Nos. 190-1 to 192-20, 196-1;
- Crompton Aff. # 1……….ECF. No. 259-2 (13-56);
- Crompton Aff. # 2……….ECF No. 189-2; and
- Ochoa Aff……………….ECF No. 189-3.

Quick Fitting's affidavits were not among its exhibits and are cited by the name of the affiant.

## A. The Industry

This case is focused on the manufacture and sale of highly engineered plumbing parts and components by entities competing in the plumbing industry; the product in issue is known by the generic term, "push-fit." Push-fit refers to a plumbing technology that allows for the permanent connection of plumbing pipes and fittings simply by pushing them together by hand without the need for soldering or other heat. QF SUF # 1 ¶ 4. The forging, manufacturing, assembly and testing of push-fit requires precise tooling and material standards to be developed and used by the manufacturer. Crompton Aff. # 2 ¶ 35. Plumbing products that can be connected using push-fit are manufactured from metal (such as copper) or synthetic raw materials by an array of manufacturers pursuant to an array of designs; some are sold unbranded and some are branded with a mark and manufactured pursuant to a particular design. WF SUF # 1 ¶ 45; QF SUF # 1 ¶ 4. For example, Mueller Industries ("Mueller") contracted with Quick Fitting for Quick Fitting to supply it with its private label brand name ProLine products, while Quick Fitting ordered ProLine products to be manufactured for Mueller by, *inter alia*, the Wai Feng parties. Crompton Aff. # 2 ¶ 55; QF SUF # 3 ¶ 70. Other push-fit brands include Shark Bite and Gator Bite, both of which are manufactured pursuant to product designs that are not the intellectual property of Quick Fitting. WF SUF # 1 ¶ 45. To be sold in the United States, all plumbing products, including push-fit, must conform to local, state and federal regulations, as well as various industry standards and certifications. Crompton Aff. # 2 ¶¶ 40-41.

## B. The Wai Feng Parties

Andrew and Jacky Yung are brothers who are originally from China and now live in Ontario, Canada. QF SUF # 1 ¶ 6. Together with their father, Jimmy Yung, they own and operate a network of companies in China, Canada and the United States (namely, Massachusetts)

that are engaged in the business of manufacturing, selling and distributing a wide range of plumbing parts and components.  Id. ¶¶ 7-8.  Their Canadian companies – Wai Mao, acting as the importer, and Wai Feng Trading, acting as the seller and distributor – are engaged in importing, selling and distributing in North America.  WF SUF # 1 ¶ 4.  At some point in 2011, Wai Feng Trading's operations and employees were shifted to EFF Inc., except that Wai Feng Trading continued the activities related to this litigation, principally the issuing of invoices and the collection of payment, as well as the maintenance of bank and accounting operations to perform those functions.[11]  QF SUF # 3 ¶ 8.

Originally, the Wai Feng parties' manufacturing was done at CCWFBV, a factory of a Chinese-based company owned by an uncle of Andrew and Jacky Yung.  A trade name, W&F Manufacturing, was used to refer to the venture comprising Wai Mao, Wai Feng Trading and CCWFBV.  WF SUF # 1 ¶ 5.  At some point between 2008 and 2011, manufacturing shifted from the uncle's factory to EFF Manufactory, a Chinese factory owned and operated by Andrew Yung.[12]  Id. ¶¶ 6-7.  Through EFF Manufactory, the Wai Feng parties manufacture a wide range of plumbing products, including products made from both copper and polyvinyl chloride ("PVC").  In addition, EFF Manufactory purchases components for its plumbing products, such

---

[11] In his declaration, Andrew Yung averred that the Wai Feng parties created EFF Inc. to take over the business of Wai Feng Trading, and that the 2011 NDA was crafted to reflect the change.  WF SUF # 1 ¶¶ 14-15.  While Quick Fitting disputes the link to the 2011 NDA, it is not disputed that, at least as to the Quick Fitting business, Wai Feng Trading continued as the operative entity.  WF Ex. 2 ¶ 13; WF SUF # 1 ¶ 15.

[12] The date of the switch is hotly disputed.  Quick Fitting's Crompton avers that he was told by Andrew Yung that manufacturing for Quick Fitting initially would be done at CCWFBV and that he was shown a different factory from what he understood was CCWFBV's factory when he came to observe the operations of EFF Manufactory.  Crompton Aff. # 2 ¶¶ 7, 9, 13.  Crompton is adamant that EFF Manufactory did not take over manufacturing from CCWFBV until April 2011.  Id. ¶¶ 12-13.  The Wai Feng parties are equally vehement that they terminated the manufacturing relationship with CCWFBV in 2008, before their first contact with Quick Fitting, and that all manufacturing for Quick Fitting was done at EFF Manufactory.  WF SUF # 1 ¶ 6.  The date matters to the extent that, if Quick Fitting is right, its proprietary designs were provided to CCWFBV so it could (and did) manufacture product to be sold to Quick Fitting, while if the Wai Feng parties are right, CCWFBV never had access to Quick Fitting's proprietary information because all manufacturing was done by EFF Manufactory.

as the retaining and release rings that were made by Cixi Welday. Prior to entering the contractual relationship with Quick Fitting, none of the Wai Feng parties had manufactured or sold push-fit products. QF SUF # 1 ¶ 9.

### C. Quick Fitting

Quick Fitting is a Rhode Island company that specializes in the design, manufacture and distribution of push-fit plumbing fittings and valves made of copper or PVC. QF SUF # 1 ¶¶ 1, 3-4. These are manufactured using design features, materials, sourcing and methods of manufacture that constitute Quick Fitting's intellectual property. QF SUF # 1 ¶ 5. According to the first affidavit signed by David Crompton, President and Chief Executive Officer ("CEO") of Quick Fitting, its push-fit products are sold "nationally," Crompton Aff. # 1 ¶ 19, while Crompton's second affidavit asserts that Quick Fitting sells "throughout North America." Crompton Aff. # 2 ¶¶ 2, 40. Although Quick Fitting has not alleged in these cases that any of its patents were infringed, it claims to have patented certain features of its push-fit product line and strives to protect as trade secrets other features, as well as the material, sourcing and methods of manufacture of its push-fit products. QF SUF # 1 ¶ 5. It is unclear whether the push-fit products in issue that were manufactured by the Wai Feng parties and sold to Quick Fitting all included design features protected by patent or as trade secrets. Compare WF Ex. 23 at 2-3 (Ochoa testifies that all Quick Fitting push-fit products are patent-protected), with WF Ex. 4 at 1 (2010 License/Supply Agreement states that not all push-fit to be manufactured for Quick Fitting would incorporate Quick Fitting's intellectual property). Quick Fitting's push-fit products are manufactured by various entities (including several manufacturers based in China) with which Quick Fitting has entered into supply agreements requiring manufacture pursuant to Quick Fitting's confidential specifications. WF SUF # 1 ¶ 13. Quick Fitting does not claim to own the

exclusive right to manufacture and sell push-fit products.  Id. ¶ 45.  Quick Fitting's push-fit

products compete with other push-fit and plumbing products sold in the United States and North

America.  WF Ex. 8 at 27.

### D.      The Buy-Sell Relationship

In late 2009 or early 2010, Crompton of Quick Fitting and Andrew Yung of the Wai Feng

parties met at a trade show and began to discuss setting up a supply relationship whereby the

Wai Feng parties would manufacture push-fit products to Quick Fitting's specifications for sale

to Quick Fitting, which would resell to its customers.  QF Ex. #3 E at 10.  These discussions

resulted in the formation of a business relationship that began in February 2010 and ended in

July 2012.  In addition to the three Agreements, the array of purchase orders and invoices limn

the supply relationship.

During the period from February 2010 until July 2012, pursuant to purchase orders issued

by Quick Fitting to "W&F" or to EFF Manufactory, push-fit products manufactured to Quick

Fitting's specifications were delivered to Quick Fitting for resale to its customers.  WF SUF # 1

¶¶ 63-67; QF Ex. # 3 N (ECF No. 196-1).  Upon the acceptance of the delivered product,[13]

invoices were sent to Quick Fitting either by EFF Manufactory or by Wai Feng Trading, which

Quick Fitting paid as agreed through October 2011.  WF SUF # 1 ¶¶ 61-63.  Quick Fitting

partially paid an invoice dated October 5, 2011, made an advance payment in March 2012 of

$45,000, and then, in July 2012, stopped paying entirely.  It is undisputed that Quick Fitting

continued to accept push-fit product for which Wai Feng Trading invoiced Quick Fitting a total

of $432,611.47, but for which Quick Fitting did not pay.  WF SUF # 1 ¶ 72; QF Ex. # 3 EEE.  It

is also undisputed that Quick Fitting sold most of this product to its customers, although it claims

---

[13] Some items – a small number per the Wai Feng parties, a large number per Quick Fitting – were rejected and returned.  WF SUF # 1 ¶¶ 64-68; QF SDF #1 ¶ 46.  The Wai Feng parties do not seek payment for these items.

that some of it had to be repaired or cleaned before it could be sold and some had to be redirected for sale in geographic regions that had not yet mandated that all plumbing parts must be lead-free; a small portion (20,699 items) was quarantined, allegedly because the items were unsalvageable.  WF SUF # 1 ¶¶ 70, 71, 73; WF Ex. 1.

Based on the non-payment of these invoices, the Wai Feng parties initiated this litigation in Canada in August 2012.

## II.    STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, summary judgment is appropriate if the pleadings, the discovery, disclosure materials and any affidavits show that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009); Commercial Union Ins. Co. v. Pesante, 459 F.3d 34, 37 (1st Cir. 2006) (quoting Fed. R. Civ. P. 56(c)).  A fact is material only if it possesses the capacity to sway the outcome of the litigation; a dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party.  Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010).  The evidence must be in a form that permits the court to conclude that it will be admissible at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986); see also Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 89 (1st Cir. 2018) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment.") (alteration omitted).  There are no trial-worthy issues unless there is competent evidence to enable a finding favorable to the nonmoving party.  Goldman v. First Nat'l Bank of Bos., 985 F.2d 1113, 1116 (1st Cir. 1993).

In ruling on a motion for summary judgment, the court must examine the record evidence in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving

party.  Mu v. Omni Hotels Mgmt. Corp., 882 F.3d 1, 5-6 (1st Cir. 2018), review denied, 885 F.3d 52 (1st Cir. 2018).  The court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury . . . or whether it is so one-sided that one party must prevail as a matter of law."  Nortel Networks Inc. v. Foundry Networks, Inc., Civil Action No. 01-CV-10442-DPW, 2003 WL 26476584, at *5 (D. Mass. Mar. 24, 2003) (quoting Paragon Podiatry Lab. v. KLM Labs., 984 F.2d 1182, 1185 (Fed. Cir. 1993)).  However, if the non-movant is the party with the burden of proof and relies on pyramids of inferences upon inferences, summary judgment is appropriate.  See Tyrell v. Dobbs Inv. Co., 337 F.2d 761, 765 (10th Cir. 1964); see also Bendis v. Alexander & Alexander, Inc., 67 F.3d 312 (10th Cir. 1995) (citing Tyrell); Jones v. Bales, 58 F.R.D. 453, 465 (N.D. Ga. 1972), aff'd, 480 F.2d 805 (5th Cir. 1973) (same).

Because these are diversity cases, Rhode Island law provides the substantive rules of decision.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).

## III.    MOTION FOR SUMMARY JUDGMENT CHALLENGING ENFORCEABILITY OF CERTAIN RESTRICTIVE CLAUSES

### A.    The Three Agreements

All of the three Agreements in issue were drafted by Quick Fitting.[14]  All were signed by Andrew Yung with no alteration of terms due to negotiation, including no correction corresponding to what the Wai Feng parties now contend were drafting errors in naming the wrong entities as parties in the first two Agreements.  WF SUF # 1 ¶¶ 10, 16-20.  All three call for the application of Rhode Island law; two of the three require that any disputes must be litigated in Rhode Island.  WF Ex. 4 ¶ 7; WF Ex. 9 ¶ 7; WF Ex. 11 ¶¶ 5.11-5.12.

---

[14] The third of the three, the 2011 License Agreement, provides that construction of the language against the drafter is waived.  WF Ex. 11 ¶ 5.18.

### 1. 2010 License/Supply Agreement

Effective as of February 16, 2010, the first of the three Agreements is the 2010 License and Supply Agreement. WF Ex. 4. It names "Quick Fitting" as "Licensor." The identity of the counter-parties, defined as "Licensee," has been, and continues to be, disputed. E.g., Quick Fitting, 2015 WL 5719503, at *2. Briefly, the Agreement recites that it is between Quick Fitting and "W&F Manufacturing"; the latter is "comprised of three divisions" – Wai Mao, Wai Feng Trading and CCWFBV. Id. As Quick Fitting's original verified complaint in 13-56 confirms and as the Court has held, the parties understood that "W&F Manufacturing" was not a company, but simply a trade name used by the Wai Feng parties – "just a name to tell our customer that we have these companies, like that we work with these companies." Id.; see ECF No. 132 at 3, 11-13 (finding W&F Manufacturing "is not an entity").

The three "divisions" were three separate entities. See Quick Fitting, 2015 WL 5719503, at *2. While Wai Mao and Wai Feng Trading are properly named (as each was to play a critical role in the business relationship as importer and distributor respectively), the Wai Feng parties contend that the naming of CCWFBV was an error committed by Quick Fitting's attorneys that was not noticed by Andrew Yung when he signed the document.[15] Id. According to the Wai Feng parties, prior to 2010, they had abandoned their venture with CCWFBV, which had been manufacturing for them. Instead, all manufacturing (including all manufacturing of product ordered by Quick Fitting) was done at EFF Manufactory, which should have been named in the 2010 License/Supply Agreement. WF Ex. 1 ¶¶ 11-13. Quick Fitting concedes that it drafted the

---

[15] Andrew Yung signed the 2010 License/Supply Agreement without authorization to execute agreements on behalf of CCWFBV. Because he signed the 2010 License/Supply Agreement on behalf of an entity for which he lacked authority to sign, and because the Agreement subjects signatories to the jurisdiction of this Court, Andrew Yung's defense of lack of personal jurisdiction was overruled, making him a party to 13-56 in his personal capacity. Quick Fitting, 2015 WL 5719503, at *7. Andrew Yung's separate summary judgment motion challenging his joinder is addressed *infra*.

document, but insists that it was told by Andrew Yung that manufacturing was to be done at

CCWFBV, which it was, Quick Fitting claims, until April 2011 when it finally shifted to the Wai

Feng parties' new manufacturing entity, EFF Manufactory.  QF SDF # 1 ¶¶ 6, 18-19 & 60;

Crompton Aff. # 1 ¶ 4; <u>see</u> WF SUF # 1 ¶ 59; QF SDF # 1 ¶ 59.[16]  To avoid confusion, the

disputed "Licensee[s]" in the 2010 License/Supply Agreement will be referred to as the "2010

WF Contracting parties."

      The portion of the 2010 License/Supply Agreement that addresses the supply relationship

contemplates that the 2010 WF Contracting parties will manufacture, and Quick Fitting "will

purchase," certain "Finished Products," which are listed on Schedule 1 as consisting of "[a]ll

sizes and variations" of push-fit fittings, valves, controls, supply line, retail packaged products

and accessories, as well as "PEX barb fittings."  WF Ex. 4 at 1, 8 (Schedule 1).  Importantly, the

2010 License/Supply Agreement expressly provides that the Finished Products "may, or may not

include . . . intellectual property of [Quick Fitting]."  <u>Id.</u> at 1.  Nevertheless, all Finished Products

were to be manufactured "for exclusive distribution by Quick Fitting."  <u>Id.</u>  The 2010

License/Supply Agreement does not address the price of the Finished Products nor does it

reference payment or delivery terms.  It does require that the Finished Products must comply

with applicable laws, regulations, specified testing standards and certifications and must be free

of defects, dirt, spotting or discoloration.  <u>Id.</u> ¶ 4(b, d).  The 2010 WF Contracting parties were

obliged to replace non-compliant products.  <u>Id.</u> ¶ 4(d).

      In the provisions of the Agreement addressing the licensing arrangement, the 2010

License/Supply Agreement provides that Quick Fitting has intellectual property (including

patents, and related concepts, processes and inventions) that it may in its sole discretion provide

---

[16] <u>See</u> n.12 *supra*.

to the 2010 WF Contracting parties in connection with the manufacture of certain of the "Finished Products." <u>Id.</u> at 1. The Finished Products that incorporate the designs and other intellectual property of Quick Fitting are the "Licensed Product." <u>Id.</u> The license permits the 2010 WF Contracting parties to use its push-fit patents in connection with the manufacture of Finished Products "containing the Licensed Product." <u>Id.</u> at 1, ¶ 1. Ancillary to the license, the 2010 License/Supply Agreement contains certain unchallenged restrictions on the use and disclosure of the information provided by Quick Fitting. In so doing, it distinguishes information that is not proprietary to Quick Fitting from "proprietary and confidential" information. <u>Id.</u> ¶ 3. As defined, "Information" is anything provided by Quick Fitting to the 2010 WF Contracting parties, whether or not proprietary; the 2010 WF Contracting parties are barred from using Information except to manufacture and distribute Finished Products for sale to Quick Fitting. <u>Id.</u> at 1, ¶ 3, 4(b). Only when Quick Fitting provides Information to the 2010 WF Contracting parties that is "designated in writing as being proprietary and confidential," are the 2010 WF Contracting parties also barred from disclosing such Information to any third party. <u>Id.</u> ¶ 3. Excluded from these limits on use and disclosure is any information that is publicly available or that was already known by, was in the possession of, or had been developed by the 2010 WF Contracting parties. <u>Id.</u> ¶ 3.

In addition to the exclusivity provision barring the 2010 WF Contracting parties from selling the Finished Products to any entity other than Quick Fitting, <u>Id.</u> ¶ 4(b), the Agreement also has a clause stating that Quick Fitting "agrees to purchase the Licensed Product described in the attached Purchase Schedule only from [the 2010 WF Contracting parties]." <u>Id.</u> ¶ 4(c). Despite this clause, throughout the period of the parties' course of dealing, Quick Fitting consistently purchased push-fit from a wide array of suppliers. WF SUF # 1 ¶¶ 12-13. Further,

this arguable exclusivity clause relates only to "Licensed Product," rather than "Finished Product"; moreover, the clause references an "attached Purchase Schedule," yet the Agreement does not have an attachment so labeled.[17]

The termination clause (¶ 5) in the body of the 2010 License/Supply Agreement provides that it continues until terminated; termination without cause requires 120 days' notice, but termination with cause needs only thirty days' notice; and the Agreement may be immediately terminated by a breach of the duties to manufacture to specification or to manufacture exclusively for Quick Fitting.[18] WF Ex. 4 ¶ 5(a-d). Post-termination, the license lapses and all use of Information provided by Quick Fitting (whether or not proprietary) must stop. Id. ¶ 6.

The Wai Feng parties do not challenge the validity of any of the restrictive clauses described above. "Schedule 2," which appears on the last page of the 2010 License/Supply Agreement, is a different story. Id. at 9.

While undisputedly part of the Agreement,[19] Schedule 2 is unsigned and is not referenced as an attachment in the body of the 2010 License/Supply Agreement. It is titled "Purchase

---

[17] An identical clause came under review in another one of the cases currently pending in this District in which Quick Fitting relies on restrictive covenants in an agreement to avoid the accusation by a Chinese supplier that Quick Fitting had failed to pay for manufactured product. Quick Fitting, Inc. v. Zhejiang Xingxin Aite Copper Mrg., Co., C.A. No. 11-463WES. In that case, the Court found the clause to be ambiguous in the context of a discovery dispute. Text Order of Dec. 27, 2016 (finding "apparent ambiguity" of "exclusivity obligation"). See also Yuhuan Jinquan Copper Co., Ltd v. Quick Fitting, C.A. No. 14-243WES.

[18] The parties dispute when and how the 2010 License/Supply Agreement was terminated. The Wai Feng parties contend that they terminated it for cause (based on Quick Fitting's breach) through notice given by their Canadian solicitor on December 7, 2012. ECF No. 223 at 5; ECF No. 223-1 at 1. Quick Fitting disputes the effectiveness of the Wai Feng parties' letter, claiming that it was not written by the right entities. ECF No. 228 at 7-8. For its part, Quick Fitting now contends that the 2010 License/Supply Agreement was terminated by operation of law in May 2011, when the parties entered into two new agreements, the 2011 NDA and License Agreement. This proposition is contradicted by Crompton's Fed. R. Civ. P. 30(b)(6) testimony that the 2011 Agreements were signed to add the name of EFF Manufactory, which had become the manufacturing arm of the Wai Feng parties, and that, otherwise the 2010 Agreement continued: "So the manufacturing arm's name had changed while everything else hadn't. So everything else stayed in place, and we created a new agreement surrounding the new manufacturing name." ECF No. 206-5 at 12.

[19] The Wai Feng parties do not challenge the authenticity of Schedule 2 as part of the 2010 License/Supply Agreement, although they do challenge the enforceability of some of its content.

Volume and Contract Term" and appears to establish the minimum purchase volumes that Quick Fitting must buy, with the duty imposed on Quick Fitting to "update volume demands on a quarterly basis to assist the Licensee in production planning and performance." Id. The record does not reveal whether Quick Fitting complied with this duty.

Consistent with the disconnect between Schedule 2 and the rest of the Agreement, Schedule 2 contradicts the body of the 2010 License/Supply Agreement in several key respects. First, contradicting the ambiguous mutual exclusivity provision in ¶ 4(c), Schedule 2 expressly specifies that exclusivity is unilateral in that the 2010 WF Contracting parties are bound by exclusivity but Quick Fitting is not. Id. at 9 ("Licensor manufactures on its own and through its other contract suppliers."). Second, Schedule 2 establishes a completely different term for the length of the relationship: rather than open-ended duration, subject to termination on notice, Schedule 2 provides for a term of "a forty-eight (48) month period" from the date of execution. Id. Third, Schedule 2 contains two clauses on non-competition and non-solicitation/ confidentiality, both of which are starkly different from the protections baked into the body of the 2010 License/Supply Agreement. These two clauses are the only ones in the 2010 License/Supply Agreement that are challenged by the Wai Feng parties.

The non-competition clause in Schedule 2 provides that the 2010 WF Contracting parties "may not compete with [Quick Fitting], directly or indirectly in any market [Quick Fitting] may serve[,]" as well as that the 2010 WF Contracting parties "may not manufacture directly or through a third party any push-fit (push connect) fittings for any party outside of [Quick Fitting.]" Id. The non-competition clause has no time or geographic limit; nor is it restricted to push-fit products that incorporate Quick Fitting's proprietary or non-proprietary information; nor

it is limited to push-fit products, as Quick Fitting "may serve" other plumbing parts or component markets.

Schedule 2's confidentiality/non-solicitation clause is also sweeping. It provides that the 2010 WF Contracting parties "may never contact, either directly or indirectly, any customer or potential customer of [Quick Fitting], whether indicated below,[20] or unknown to [the 2010 WF Contracting parties], for any purpose." Id. This clause is unlimited in time, geography and subject matter scope. Because it is undisputed that the Wai Feng parties were established as manufacturers and sellers of plumbing products before they entered into the Quick Fitting relationship, see WF SUF # 1 ¶¶ 3-4, this confidentiality clause prohibits them from contacting even their own customers.

The severance clause in ¶ 9(f) of body of the 2010 License/Supply Agreement provides that, "[s]hould all or any portion of any provision of this Agreement be held unenforceable or invalid for any reason, the remaining portions or provisions shall be unaffected." WF Ex. 4 ¶ 9(f).

### 2.      2011 NDA

Fifteen months into the parties' relationship, on May 4, 2011, the 2011 NDA was executed. WF Ex. 9. The second of the three Agreements, it neither confers a license nor is a supply agreement, but simply imposes non-disclosure obligations. Like the 2010 License/Supply Agreement, there is confusion regarding what entity was meant to be the proper party on the Wai Feng parties' side. Briefly, it names EFF LLC, the Massachusetts entity that had little to do with

---

[20] Nothing is "indicated below," leaving this phrase of the confidentiality clause meaningless. Quick Fitting has admitted that it never provided the Wai Feng Parties with a list of customers or even prospective customers to which this prohibition would apply. WF SUF # 1 ¶ 82. In his Fed. R. Civ. P. 30(b)(6) deposition, when Crompton was asked whether Quick Fitting ever provided this list of the customers covered by this prohibition, he testified: "I don't know why we would. We would never have been required to. That would have never been anything we would have done with them. They were precluded from selling push fit, period, whether it was customers or not." ECF No. 206-7 at 2; see n.22 infra.

the relationship with Quick Fitting; the Wai Feng parties say it should have named EFF Inc.; while Crompton testified that it should have been "a new company, 'EFF,' that was located in 'Toronto and in China'" and that the new company would be taking over the manufacturing operations formerly handled by the 'W&F Manufacturing' factory."[21]  Crompton Aff. # 2 ¶¶ 12-13.

The substance of the 2011 NDA is also limited.  In scope, it operates solely to protect confidential information ("Information") that was provided by Quick Fitting to the counter-party (whoever it might be) about its push-fit products for the sole purpose of procuring cost estimates for specified components.  WF Ex. 9 ¶ I(B).  For Information to be protected by the 2011 NDA, Quick Fitting could, but was not obligated, to label it as confidential.  Id. ¶ I(3).  The 2011 NDA barred the recipient from disclosing Information or using it to compete against Quick Fitting.  Id. ¶ I(1)

Only one clause in the 2011 NDA is challenged as overbroad and unenforceable.  It is an outright ban on any "contact, communicat[ion] or negotiat[ion] with any competitor, supplier, customer or prospect" of Quick Fitting; this clause has no time or geographic limit and no direct relationship to the protection of the confidential information covered by the 2011 NDA.  Id. ¶ I(1)(h).  Unlike the analogous clause in the 2010 License/Supply Agreement, the 2011 NDA does require that the identity of the companies with which contact is forever prohibited must be "readily known[ or] disclosed by Quick Fitting or made known to the Recipient by any communication" from Quick Fitting.[22]  Id.

---

[21] The Court has previously addressed the confusion over which EFF entity is named in the 2011 NDA.  Quick Fitting, 2015 WL 5719503, at *3 (naming of EFF LLC in 2011 NDA "appears to be wrong . . . EFF LLC apparently has nothing to do with the business arrangement with Quick Fitting.").

[22] It is undisputed that Quick Fitting never provided any of the Wai Feng parties with a list of entities it considered to be covered by this contact ban.  WF SUF # 1 ¶ 82.  Quick Fitting counters that it regularly communicated with the Wai Feng parties regarding the identity at least of its "customers, markets, and marketing efforts," QF SDF # 1 ¶ 82,

The 2011 NDA arguably survived only three weeks in that it is expressly "supercede[d] and replace[d]" by the 2011 License Agreement. WF Ex. 11 ¶ 1.2. It is silent regarding the effect of a judicial finding that any of its terms are invalid or unenforceable.

### 3. 2011 License Agreement

Three weeks later, on May 31, 2011, the third agreement, the 2011 License Agreement, was executed. This one correctly names EFF Manufactory as the counter-party. Unlike the 2010 License/Supply Agreement, but like the 2011 NDA, the 2011 License Agreement is not a supply agreement.[23] Rather, it simply licenses EFF Manufactory to receive Quick Fitting's intellectual property[24] regarding its push-fit line of products "exclusively for the purpose of providing cost estimates and business proposals for the manufacture and supply of certain products and component parts of products in the hope that Quick Fitting will purchase said products and components [sic] parts from [EFF Manufactory]." WF Ex. 11 at 1. It also provides a non-exclusive license to EFF Manufactory to use listed patents, trademarks, and drawings and similar materials belonging to Quick Fitting for "the manufacture and supply . . . to Quick Fitting." Id. ¶ 3.1. It leaves Quick Fitting free to license any other entity. Id. ¶ 3.2. It does not oblige Quick Fitting to place any orders: "Quick Fitting makes no representation that it will enter into a relationship; and is under no obligation to enter into any further agreement." Id. ¶ 5.2. Although

---

[23] Although EFF Manufactory is identified in the preamble to the Agreement as the "Supplier," and although Quick Fitting's briefs repeatedly refer to the 2011 License Agreement as a "supply" agreement, e.g., ECF No. 193 at 5 ("2011 License and Supply Agreement") (emphasis added), it is a license agreement with restrictive covenants that contemplates the possibility of a supply relationship, but expressly eschews forming one. WF Ex. 11 ¶ 5.2.

[24] The 2011 License Agreement defines the covered intellectual property as "all information provided by Quick Fitting to [EFF Manufactory] . . . pertaining to Quick Fitting quick connection valves, fitting and controls," as well as to its designs, product development, customers, prospects, costs, and financial information. WF Ex. 11 ¶ 1.3. It also includes the identities of customers and prospective customers of Quick Fitting "at any time." Id. It does not include information that is generally publicly available or information that was provided to EFF Manufactory by a third party or information that was independently developed by EFF Manufactory. Id. ¶¶ 1.3-1.5.

although it makes no mention of who is in the class of "competitor [or] supplier," or how the counter-party to the 2011 NDA would have known what entities were its competitors and suppliers. WF Ex. 9 ¶ I(1)(h); see n.20 supra.

many of its terms are keyed to "termination," the 2011 License Agreement has no termination

clause; under Rhode Island law, this means that it is terminable at will on reasonable notice.  See

Chapman v. Vendresca, 426 A.2d 262, 264 n.2 (R.I. 1981) ("when contract does not specify time

within which notice of termination must be given, terminating party has reasonable time") (citing

Coopersmith v. Isherwood, 150 A.2d 243, 247-48 (Md. 1959)).

The 2011 License Agreement contains a lengthy Section II, which deals with EFF

Manufactory's treatment of Quick Fitting's "confidential information," as defined in ¶ 1.3.  WF

Ex. 11 ¶¶ 2.1-2.8.  The Wai Feng parties do not challenge any of the clauses contained in Section

II, which bar any disclosure or use of the confidential information, except as necessary to

manufacture push-fit to be sold to Quick Fitting.  Section IV of the 2011 License Agreement is

headed "Terms of Non-Competition."  Id. ¶¶ 4.1-4.7.  Its first two clauses focus on the

confidential intellectual property covered by the Agreement, preventing EFF Manufactory from

using it to "compete with, defame, hinder, or cause harm" to Quick Fitting.  Id. ¶ 4.1.  They also

prevent EFF Manufactory from selling products "utilizing" the confidential information covered

by the Agreement to any party other than Quick Fitting as directed by Quick Fitting.  Id. ¶¶ 4.1-

4.2.  The Wai Feng parties do not challenge these two clauses either.  Rather, the motion is

focused on three of the remaining clauses, which appear in Section IV.

The first challenged clause is at ¶ 4.6 and titled, "Liquidated Damages/Contract Penalty."

It provides that any breach of any clause in the non-competition section of the Agreement shall

result in a contract penalty of $500,000, in addition to any damages Quick Fitting is able to

prove.  Id. ¶ 4.6.  During his Fed. R. Civ. P. 30(b)(6) deposition, Crompton testified that he did

not know how the amount in the "Liquidated Damages/Contract Penalty" clause was determined,

except that the amount was chosen to be "punitive."  WF Ex. 8 at 29-30.  After the Wai Feng

parties' challenge to this clause was filed, Crompton executed his second affidavit, in which he averred to a changed understanding that the clause reflected an estimate of business losses. Crompton Aff. # 2 ¶¶ 15, 33-37.

The second challenged clause is the non-compete in ¶ 4.3.  WF Ex. 11 ¶ 4.3.  It permanently bans EFF Manufactory from ever, "directly or indirectly through others, compet[ing] with Quick Fitting in the design, manufacture, supply, sale, or distribution of push-fit connection valves, fittings, supply line or controls."  Id.  Infinite in duration and worldwide in geographic scope, ¶ 4.3 is not limited to push-fit products incorporating either Quick Fitting's intellectual property or its non-proprietary information – it effectively bars EFF Manufactory from ever entering any push-fit market anywhere, including from manufacturing pursuant to the specifications of another owner of push-fit designs, as well as from developing its own push-fit designs.  In his Fed. R. Civ. P. 30(b)(6) deposition, Crompton described his view of the non-competition clause:

> It would be my understanding that [the Wai Feng parties] were precluded from selling anything related to push fit products to any potential customers or competitors in North America, period.

WF SUF # 1 ¶ 75 (citing WF Ex. 17 at 7-8).[25]

Third is the challenged non-solicitation/confidentiality clause in ¶ 4.4.  WF Ex. 11 ¶ 4.4.  Unlike the other challenged restraints, it is limited in duration to three years following the termination of the 2011 License Agreement.  Id.  During that three-year period, EFF Manufactory is barred from any contact or communication with any "customer or prospective

---

[25] No limitation to North America appears in the Agreement.  While Quick Fitting has not argued that its restrictive clauses should be interpreted as limited to North America based on this testimony, the Court notes that it could not, in that a party cannot retroactively make the terms of the non-compete provision palatable by now asserting that it did not plan on enforcing the provision as it is written; the acceptance of such a position would effectively allow clauses that violate public policy to flourish until confronted by the prospect of litigation and the reality of unenforceability.  See Webster Ins., Inc. v. Levine, No. X06CV074016194S, 2009 WL 5698072, at *3 (Conn. Super. Ct. Apr. 29, 2009).

customer of Quick Fitting" or with the representatives of such entities, including (but not limited to) any known to be such by EFF Manufactory.  Id.  And, if any such "Prohibited Party" or its representative should contact EFF Manufactory, EFF Manufactory must not respond but must forward such communication to Quick Fitting.  Id. ¶ 4.5.  This ban on all communication and contact is not limited as to subject matter.

The 2011 License Agreement includes a provision that mandates how a court should proceed in the event that any of the clauses are held invalid or unenforceable: "such invalidity shall not affect the validity or operation of any other provision and such invalid provision shall be deemed to be severed from the Agreement."  Id. ¶ 5.21.

### B.    Law and Analysis Applicable to Enforceability of Restrictive Clauses

When contract language is clear and unambiguous, summary judgment is an appropriate vehicle for resolving contract interpretation disputes.  See Mallane v. Holyoke Mut. Ins. Co., 658 A.2d 18, 20 (R.I. 1995); Elliott v. S.D. Warren Co., 134 F.3d 1, 9 (1st Cir. 1998).  "Contract interpretation, including whether any ambiguities exist in the disputed contractual terms, is generally a question of law for the [c]ourt."  Doe v. W. New England Univ., 228 F. Supp. 3d 154, 170 (D. Mass. 2017); see Rotelli v. Catanzaro, 686 A.2d 91, 94 (R.I. 1996); Kelly v. Tillotson-Pearson, Inc., 840 F. Supp. 935, 944 (D.R.I. 1994) (quoting In re Navigation Tech. Corp., 880 F.2d 1491, 1495 (1st Cir. 1989)).  When a clause is clear and unambiguous on its face, the role of the court is to enforce it as written.  Kelly, 840 F. Supp. at 944 (quoting Aetna Casualty & Sur. Co. v. Graziano, 587 A.2d 916, 917 (R.I. 1991)).  "In determining whether or not a particular contract is ambiguous, the court should read the contract 'in its entirety, giving words their plain, ordinary, and usual meaning.'"  T.G. Plastics Trading Co. Inc. v. Toray Plastics (Am.), Inc., 958 F. Supp. 2d 315, 321-22 (D.R.I. 2013) (quoting Haviland v. Simmons,

45 A.3d 1246, 1258 (R.I. 2012)). "[A] contract is ambiguous only when it is reasonably and clearly susceptible of more than one interpretation." Rotelli, 686 A.2d at 94.

If an ambiguity is found and the extrinsic evidence of the intent of the parties is factually disputed, summary judgment is inappropriate and the proper construction of the contract is a question of fact for the fact finder. Toray, 958 F. Supp. 2d at 322; see OfficeMax Inc. v. Sousa, 773 F. Supp. 2d 190, 216 (D. Me. 2011) (court "may look to extrinsic evidence of the intent of the parties") (quoting Villas by the Sea Owners Ass'n v. Garrity, 748 A.2d 457, 461 (Me. 2000)). However, even if a contract is ambiguous, when there are no facts in dispute, the interpretation of a contract is a question of law for the court. OfficeMax Inc., 773 F. Supp. 2d at 216. "The preferable approach is to interpret a contract in a manner which will give effect to all of its provisions," and "where two clauses of an agreement appear to be in direct conflict, it is the duty of the court to reconcile the two clauses to give effect to the whole of the instrument." Jadwin v. Cty. of Kern, 610 F. Supp. 2d 1129, 1191 (E.D. Cal. 2009) (quoting In re Steven A., 15 Cal. App. 4th 754, 771 (1993); In re Marriage of Whitney, 71 Cal. App. 3d 179, 182 (1977)).

### 1. "Liquidated Damages/Contract Penalty" Clause

The clause challenged as an improper penalty is titled "Liquidated Damages/Contract Penalty," and set out in ¶ 4.6 of the 2011 License Agreement. In full, it provides:

> Liquidated Damages/Contract Penalty. Supplier acknowledges and agrees that any violation or breach of this Non-Competition section of this Agreement: (i) shall result in a contract penalty against supplier in an amount not less than five-hundred-thousand dollars and zero cents ($500,000) (the "Contract Penalty"), payable to Quick Fitting within thirty (30) days after invoicing of this amount to Supplier; (ii) that Quick Fitting is authorized to withhold all or any portion of the Contract Penalty from any payments otherwise due to Supplier until such Contract Penalty is fully paid; and (iii) that the Contract Penalty amount shall be in addition to and shall not reduce the amount of actual damages Quick Fitting is able to prove for any breach or violation of this or any other section of this Agreement.

WF Ex. 11 ¶ 4.6. It appears only in the third of the three Agreements, in which EFF Manufactory is the only party for the Wai Feng parties. Id. The content of ¶ 4.6 is not ambiguous – it crisply and clearly provides that EFF Manufactory must pay a "contract penalty" of $500,000 in the event of any violation or breach of any of the clauses in Section IV of the Agreement. The Section IV clauses[26] include: (1) the ban on using Quick Fitting's confidential information to compete with Quick Fitting (¶ 4.1); (2) the ban on making push-fit with Quick Fitting designs for sale to third parties (¶ 4.2); (3) the absolute ban on ever competing with Quick Fitting by designing, manufacturing or selling any push-fit product (without regard to whether any Quick Fitting confidential information is used) anywhere in the world (¶ 4.3); and (4) the absolute ban on any communication regarding any topic with any customer or prospective customer of Quick Fitting (who may well be pre-existing customers of the Wai Feng parties) for three years following the termination of the Agreement (¶ 4.4). The "Liquidated Damages/Contract Penalty" clause also absolves Quick Fitting from paying what it owes EFF Manufactory until the "Contract Penalty" is paid in full. Id. ¶ 4.6. Confirming that it is not in lieu of damages, ¶ 4.6 provides that "the Contract Penalty amount shall be in addition to and shall not reduce the amount of actual damages Quick Fitting is able to prove for any breach or violation of this or any other section of this Agreement." Id.

During Quick Fitting's October 27, 2015, Fed. R. Civ. P. 30(b)(6) deposition, Crompton testified that he did not know how the amount in the Liquidated Damages/Contract Penalty clause was determined. WF Ex. 8 at 28-29. He stated, "I can't speak to that[,]" and offered, "[i]t was *put in there to be punitive* to really thwart them, deter them from doing it." Id. at 28-30 ("the number is picked as a deterrent") (emphasis added). Crompton directly contradicted this

---

[26] Two of these Section IV clauses (¶¶ 4.3 and 4.4) are challenged as unenforceable. The remainder are not challenged.

Fed. R. Civ. P. 30(b)(6) testimony in his second affidavit, which was filed with Quick Fitting's opposition to the motion challenging the clause as an unenforceable penalty. In this changed testimony, he avers that the penalty actually represented an "estimate of our loss of business or loss of business profitability over time" that Quick Fitting would incur if one of its contracting manufacturers breached its contractual obligations, as well as the cost of finding a new manufacturer. Crompton Aff. # 2 ¶¶ 15, 33-37. Crompton's second affidavit alters his earlier description of the clause as merely punitive, asserting, "[a]ny reference to the word 'punitive' in deposition testimony was intended to reflect my expectation that the amount would be significant enough to offset the aspects of harm and costs described here, which we anticipated but found difficult to estimate." Id. ¶ 37.

Rhode Island law distinguishes contractual penalties from liquidated damages. The former are unenforceable as a matter of public policy, while the latter may be enforceable if the harm caused by the breach is difficult to estimate and the amount fixed is a reasonable forecast of actual harm. See ADP Marshall, Inc. v. Noresco, LLC, 710 F. Supp. 2d 197, 234-35 (D.R.I. 2010) (citing Howarth v. Feeney, P.C. No. 86-3543, 1992 WL 813502, at *3 n.2 (R.I. Super. Jan. 15, 1992) ("a sum of money . . . to be forfeited in case of breach, may be either a penalty or liquidated damages"), amended, No. C.A. No. 80-265, 1992 WL 813534 (R.I. Super. Mar. 17, 1992)); Psaty & Fuhrman v. Hous. Auth. of City of Providence, 68 A.2d 32, 38-39 (R.I. 1949) (if contract for liquidated damages amounts to imposition of penalty, it is unenforceable; "we consider the provision for liquidated damages . . . as coercive in nature and therefore in substance the imposition of a penalty"). To differentiate a true liquidated damages clause from an unenforceable contract penalty, Rhode Island courts rely on three criteria: first, the injury caused by the breach must be difficult accurately to estimate; second, the parties must intend to

provide for damages rather than a penalty; and third, the sum stipulated must be a reasonable pre-estimate of the loss. Aetna Cas. & Sur. Co. v. R.I. Elec. Protective Co., No. 78-1761, 1979 WL 200238, at *1 (R.I. Super. Jan. 5, 1979). Reinforcing the importance of this judicially-created policy, the Rhode Island legislature adopted the same principle when it enacted the Rhode Island Uniform Commercial Code. See R.I. Gen. Laws § 6A-2-718 ("[d]amages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in light of the anticipated or actual harm caused by the breach"). To be enforceable, the purpose of the clause must be to compensate for loss, not to punish. Allstate Interiors & Exteriors, Inc. v. Stonestreet Constr., LLC, 907 F. Supp. 2d 216, 247 (D.R.I. 2012). The label placed on the clause by the drafter is not dispositive – a self-described liquidated damages clause must be condemned if it is punitive in effect. Omni-Combined W.E., LLC v. 20/20 Commc'ns, Inc., No. PB 10-2530, 2012 WL 1957733, at *4 (R.I. Super. May 18, 2012) (accelerated rent clauses are enforceable if "they do not constitute a penalty").

Courts in other states applying the same principles have declined to enforce a fixed penalty because such a set sum can have no rational relationship to anticipated actual damages. Willard Packaging Co. v. Javier, 899 A. 2d 940, 955-56 (Md. Ct. Spec. App. 2006) (fixed sum penalty – $50,000 – is unenforceable); see XCO Intern. Inc. v. Pac. Scientific Co., 369 F.3d 998, 1004 (7th Cir. 2004) (if sanction is fixed and outsized, such as "$500,000, period," it is highly likely to be prohibited a penalty). A fixed sum is particularly vulnerable to condemnation as a penalty if the same sanction for breach of varying provisions in an agreement is imposed without regard to the differing injury that each breach might inflict. Monsanto Co. v. McFarling, 363 F.3d 1336, 1346 (Fed. Cir. 2004) (applying Missouri law and stating, "[t]his fixed rule of Missouri contract law is not unusual. Variations on this anti-one-size rule are applied in a

number of jurisdictions"); United States v. J.C. Martin Lumber Co., 246 F.2d 58, 62 (5th Cir. 1957) (applying Mississippi law and labeling a contractual damages clause a penalty because it provided for double payment and "without discrimination, provides the same penalty for leaving marked trees uncut as for cutting unmarked tress, and, as to trees injured through carelessness, provides the same penalty without regard to the extent in each case of the injury").

Another important characteristic of an unenforceable penalty is the ability of the non-breaching party to recover both the so-called liquidated damages, as well as actual damages resulting from the breach. See Nat'l Fitness Ctr., Inc. v. Atlanta Fitness, Inc., 902 F. Supp. 2d 1098, 1108-09 (E.D. Tenn. 2012) (where "liquidated damages" in license agreement is fixed sum that does not supplant other available remedies, it acts as a penalty and may not be enforced); Webster Ins., 2009 WL 5698072, at *2 ("contract provision that authorizes the non-breaching party to recover both actual damages and all revenues earned as a result of the breach constitutes an invalid penalty, unenforceable as a matter of public policy"). And if a liquidated damages provision is "designed to coerce performance by punishing default[,]" any doubt as to its character must be resolved by finding it to be an unenforceable penalty. Captain D's, LLC v. Arif Enters., Inc. No. 3:09-00809, 2010 WL 5060289, at *9 (M.D. Tenn. Dec. 6, 2010) (quoting Guesthouse Int'l Franchise Sys., Inc. v. British Am. Props. MacArthur Inn, LLC, No. 3:07-0814, 2009 WL 278214, at *9-10 (M.D. Tenn. Feb. 5, 2009)).

The validity of a liquidated damages clause is a pure question of law for the court. See Clark-Fitzpatrick, Inc./Franki Found. v. Gill, 652 A.2d 440, 443 (R.I. 1994) ("Contract interpretation is a question of law; it is only when contract terms are ambiguous that construction of terms becomes a question of fact."); Wholey Boiler Works v. Lewis, 123 A. 595, 598 (R.I. 1924) ("The question whether a deposit or other payment is to be regarded as a penalty or

liquidated damages is to be decided upon consideration of the provisions of the whole agreement, in view of the circumstances of each case; and the intention of the parties as thus disclosed is the decisive test."); see also Olcott Intern. & Co..v. Micro Data Base Sys., Inc., 793 N.E. 2d 1063, 1077 (Ct. App. Ind. 2003) ("the question whether a liquidated damages clause is valid, or whether it constitutes an unenforceable penalty, is a pure question of law for the court"). The party challenging the enforceability of a liquidated damages clause has the burden of proving that it is a penalty. Honey Dew Assocs. v. M & K Food Corp., 241 F.3d 23, 27 (1st Cir. 2001).

Applying these principles to the 2011 License Agreement is an easy task in light of the clarity of ¶ 4.6. Apart from the heading, Quick Fitting has drafted the operative clause such that it unambiguously amounts to a penalty. For starters, the $500,000 consequence is an outsized sum, XCO Intern. Inc., 369 F.3d at 1004, which is expressly defined as a "Contract Penalty," in that the clause expressly recites that "any violation or breach . . . shall result in a contract penalty . . . in an amount not less than [$500,000.]" WF Ex. 11 ¶ 4.6. It clearly operates as a penalty because it is a fixed one-size-fits-all consequence applied for breach of an array of non-competition clauses, Monsanto Co., 363 F.3d at 1346, to be imposed without regard to whether the harm caused by a breach is substantial or mild, XCO Intern. Inc., 369 F.3d at 1004. Also pellucid is that it is not intended as an estimate of hard-to-calculate damages. To the contrary, ¶ 4.6 expressly provides that "the Contract Penalty amount shall be *in addition to* and shall not reduce the amount of actual damages Quick Fitting is able to prove for any breach or violation of this or any other section of this Agreement." WF Ex. 11 ¶ 4.6 (emphasis added). The clause's imposition of a penalty that also permits recovery of actual damages is further reason why it must be condemned as an outright penalty. See Psaty, 68 A.2d at 39; Nat'l Fitness Ctr., Inc., 902

F. Supp. 2d at 1108-09. Accordingly, in reliance on the plain and unambiguous text of ¶ 4.6, I find that Quick Fitting attempted to impose a draconian penalty contrary to the public policy of Rhode Island, so that this Court should hold that ¶ 4.6 is unenforceable.

A lingering issue is whether the ambiguity in the heading – "Liquidated Damages/Contract Penalty" – somehow saves the day. This heading seems to be an attempt by the drafter to straddle the fence between liquidated damages and penalty, while actually crafting text that is unambiguously a penalty. There are several problems with this proposition. First, Quick Fitting has not asserted this argument; indeed, it does not contend that any aspect of ¶ 4.6 is ambiguous. Second, traditional principles of construction stipulate that headings cannot alter the plain meaning of the text. See Bhd. of R. R. Trainmen v. Baltimore & O. R. Co., 331 U.S. 519, 527-28 (1947) ("[H]eadings and titles are not meant to take the place of the detailed provisions of the text. Nor are they necessarily designed to be a reference guide or a synopsis."); Lyons v. Ga.-Pac. Corp. Salaried Emps. Ret. Plan, 221 F.3d 1235, 1246 (11th Cir. 2000) ("reliance upon headings to determine the meaning of a statute is not a favored method of statutory construction"); see also Navarro-Ayala v. Hernandez-Colon, 951 F.2d 1325, 1352 (1st Cir. 1991) (no individual provision, even a heading, should be interpreted in isolation from its context within the document as a whole). Third, Rhode Island cases teach that the court interpreting such a clause must look beyond labels to substance and condemn those that have the effect of a penalty despite an attempt to hide the penalty in the raiment of liquidated damages. See, e.g., Allstate Interiors & Exteriors, Inc., 907 F. Supp. 2d at 247-48 (with no damages, liquidated damages clause punitive in effect and unenforceable); Howarth, 1992 WL 813502, at *3 (otherwise valid liquidated damages clause becomes punitive and unenforceable if it imposes damages when none were incurred); cf. Applied Elastomerics, Inc. v. Z-Man Fishing Prods.,

Inc., 521 F. Supp. 2d 1031, 1044-45 (N.D. Cal. 2007) (applying California law, whether contract uses label "penalty" or "liquidated damages" is not determinative; court must interpret clause based on substance); see also Omni-Combined W.E., LLC, 2012 WL 1957733, at *7-8 (lease acceleration clause under examination at summary judgment found not to be punitive in effect and therefore enforceable).

To save ¶ 4.6, Quick Fitting asks the Court to focus on Crompton's testimony in his second affidavit, which contradicts his Fed. R. Civ. P. 30(b)(6) testimony on the same topic. Without explaining why unambiguous contract language should be interpreted by reference to extrinsic evidence, Quick Fitting argues that the Court should find that it crafted ¶ 4.6 because the harm flowing from a breach would be difficult to quantify and that $500,000 is reasonable because it approximates the costs of bringing a new supplier up to speed.[27]

This extrinsic evidence argument is unavailing. A threshold problem is that Quick Fitting has not even argued that ¶ 4.6 is ambiguous, which it must be for the Court to consider such extrinsic evidence of what the parties intended. Toray, 958 F. Supp. 2d at 322. And this penalty clause is simply not ambiguous; therefore, the Court must interpret the Agreement's words (chosen by Quick Fitting) and cannot rely on Crompton's extrinsic evidence of intent contrary to the meaning of the words. In any event, if the Court were inclined to consider any extrinsic evidence, the operative testimony would be Crompton's answers during his Fed. R. Civ. P. 30(b)(6) deposition that $500,000 was selected to be punitive and that, otherwise, Crompton has no information suggesting any relationship to actual damages. The averments in the clearly contradictory affidavit later submitted to avoid summary judgment, with no satisfactory explanation for why the testimony was changed, should be disregarded as a sham. A.J. Amer

---

[27] This argument ignores that ¶ 4.6 is embedded in an Agreement that explicitly provides that Quick Fitting was not obligated to purchase any product or to establish EFF Manufactory as a supplier. WF Ex. 11 at 1, ¶ 5.2.

<u>Agency, Inc. v. Astonish Results, LLC</u>, C.A. No. 12-351 S, 2014 WL 3496964, at *12-13 (D.R.I. July 11, 2014) (contradictory portions of affidavit may be treated as sham and disregarded at summary judgment).  So even if the Court did look beyond the Agreement's words, the cognizable extrinsic evidence confirms that this clause is a paradigmatic penalty intended to be an *in terrorem* spur to compliance, and not as a fair estimate of damages.  It is well-settled contract law that courts do not give their imprimatur to such arrangements.  <u>Priebe & Sons v. United States</u>, 332 U.S. 407, 413 (1947).

Based on the foregoing, I recommend the Court find that ¶ 4.6 of the 2011 License Agreement ("Liquidated Damages/Contract Penalty") is unenforceable and deem it severed from the Agreement.[28]

### 2.    Non-competition Clauses

The Wai Feng parties challenge two non-competition clauses in Schedule 2 of the 2010 License/Supply Agreement.  They provide:

> [2010 WF Contracting parties] will only manufacture fittings for [Quick Fitting] exclusively and may not enter into any agreement to manufacture push fit fittings for any other company.
> . . .
>
> [2010 WF Contracting parties] may not compete with [Quick Fitting], directly or indirectly in any market [Quick Fitting] may serve.  [2010 WF Contracting Parties] may not manufacture directly or through a third party, any push fit (push connect) fittings for any party outside of [Quick Fitting].

WF Ex. 4 at 9.  These clauses lack any limits with respect to time and geography.  In scope, they broadly apply not just to the push-fit products manufactured using Quick Fitting's information (whether or not proprietary) but to any push-fit product, including push-fit developed independently by the Wai Feng parties and push-fit manufactured to the specifications of a

---

[28] Based on this recommendation, I do not address the Wai Feng parties' alternative argument that Quick Fitting never sent the contractually mandated "invoice" and therefore the $500,000 penalty is not yet due.

design developed by a third party unrelated to Quick Fitting. The second of the two clauses goes beyond push-fit and beyond direct competition with Quick Fitting, barring the 2010 WF Contracting parties from competing in any market Quick Fitting "may serve," arguably barring the Wai Feng parties from competing in any plumbing product market anywhere in the world, effectively putting them out of business.

The Wai Feng parties also challenge the enforceability of one non-competition clause in the 2011 License Agreement. The challenged 2011 clause provides:

> Due to the nature of the Confidential Information and [EFF Manufactory's] unique access to it, [EFF Manufactory] agrees that it shall not, during the term of this Agreement or at any time thereafter, either directly or indirectly through others, compete with Quick Fitting in the design, manufacture, supply, sale, or distribution of push-fit connection valves, fittings, supply line or controls.

WF Ex. 11 ¶ 4.3. Like the challenged clauses from the 2010 License/Supply Agreement, ¶ 4.3 has no temporal or geographic limits and sweeps in all push-fit products without regard to whether any Quick Fitting information – proprietary or not – was used to develop them. Id.

The Rhode Island Supreme Court has long enforced the principle that covenants not to compete are disfavored and subject to strict judicial scrutiny. Cranston Print Works Co. v. Pothier, 848 A.2d 213, 219-20 (R.I. 2004). When considering the validity of a noncompetition agreement, the crucial issue is reasonableness, and that test is dependent upon the particular circumstances surrounding the agreement. Durapin, Inc. v. Am. Prods., Inc., 559 A.2d 1051, 1053 (R.I. 1989). Rhode Island courts enforce such provisions if the party seeking to enforce the non-competition clause can demonstrate that the restriction is ancillary to an otherwise valid transaction or relationship, and that "the contract is reasonable and does not extend beyond what is apparently necessary for the protection of those in whose favor it runs." Cranston Print Works Co., 848 A.2d at 220 & n.2; see also Macro Niche Software, Inc. v. 4 Imaging Solutions, L.L.C.,

Civil Action No. H-12-2293, 2013 WL 12140417, at *6 (S.D. Tex. Dec. 18, 2013) (covenant not to compete is enforceable if ancillary to enforceable agreement and "contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee").

To aid in this analysis, the Rhode Island Supreme Court has adopted the principles set out in the Restatement (Second) Contracts,[29] which require courts to examine what is necessary to protect the specific interest contained in the "valid transaction or relationship" to which the restraint is ancillary. Home Gas Corp. of Mass. v. DeBlois Oil Co., 691 F. Supp. 567, 572-73 (D.R.I. 1987); see R. J. Carbone Co. v. Regan, 582 F. Supp. 2d 220, 225 (D.R.I. 2008). In interpreting such a clause in the licensing context, the important public policy interest favoring robust competition must guide the Court's analysis. See R.I. Gen. Laws § 6-36-2 (purpose of Rhode Island antitrust law to "promote the unhampered growth of commerce and industry throughout the state by prohibiting unreasonable restraints of trade and monopolistic practices, inasmuch as these have the effect of hampering, preventing, or decreasing competition"); Max

---

[29] These provide:

(1)      A promise to refrain from competition that imposes a restraint that is ancillary to an otherwise valid transaction or relationship is unreasonably in restraint of trade if
     (a)      the restraint is greater than is needed to protect the promisee's legitimate interest, or
     (b)      the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public.

(2)      Promises imposing restraints that are ancillary to a valid transaction or relationship include the following:
     (a)      a promise by the seller of a business not to compete with the buyer in such a way as to injure the value of the business sold;
     (b)      a promise by an employee or other agent not to compete with his employer or other principal;
     (c)      a promise by a partner not to compete with the partnership.

Restatement (Second) Contracts § 188 (1981).

Garelick, Inc. v. Leonardo, 250 A.2d 354, 357 (R.I. 1969) (restrictive covenant may not be "contrary to public policy"); see also Crye Precision LLC v. Bennettsville Printing, 15-cv-00221(FB)(RER), 2017 WL 4325817, at *8 (E.D.N.Y. Sept. 27, 2017) ("Courts analyze restrictive covenants in commercial contracts, such as license agreements, 'under a simple rule of reason, balancing the competing public policies in favor of robust competition and freedom to contract.'"); Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp., 369 N.E.2d 4, 6 (N.Y. 1977) (When "broad-sweeping language is unrestrained by any limitations keyed to uniqueness, trade secrets, confidentiality or even competitive unfairness[, i]t does no more than baldly restrain competition. This it may not do. . . . [O]n its face the covenant is too broad to be enforced as written."). Thus, while "protecting a business's confidential information and goodwill – such as the special relationship its sales force has developed with customers – may qualify as a legitimate interest," Bluez4 Corp. v. Macari, No. KC 2016-1087, 2017 WL 2620125, at *3 (R.I. Super. June 13, 2017) (citing Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 17 (1st Cir. 2009)), "the desire to be free from competition, by itself, is not a protectable interest." Durapin, 559 A.2d at 1057; see Home Gas, 691 F. Supp. at 573-74 ("There is no purpose for the provision other than an anti-competitive purpose, and, it is therefore invalid.").

The reasonableness of a restrictive covenant is a question of law to be determined by the judge. Durapin, 559 A.2d at 1053. While not *per se* unenforceable, the lack of temporal and geographic limitations in a non-compete are particularly concerning. Cranston Print Works Co., 848 A.2d at 220 (lack of geographic limit enforceable only if business to which restraint is ancillary is international in character; lack of temporal limit unreasonable if duration longer than necessary to protect legitimate commercial interest in protecting confidential information and trade secrets); see Max Garelick, 250 A.2d at 356-57 ("The rule, now generally received, has

been recognized in this State, that contract in restraint of trade are not necessarily void by reason of universality of time, . . . nor of space . . ., but they depend upon the reasonableness of the restrictions under the conditions of each case.") (ellipses in original).

The application of these principles here requires the Court first to focus on the protectable interest arising from the nature of the transactions between Quick Fitting and the Wai Feng parties. The arrangement contained in the 2010 License/Supply Agreement is a true license and supply relationship; it establishes that Quick Fitting would provide access to its proprietary and non-proprietary information, which the WF Contracting parties would use to manufacture push-fit for sale only to Quick Fitting, which committed to purchase. WF Ex. 4. By contrast, the challenged non-compete clauses in the 2011 License Agreement are ancillary to an arrangement that is more narrow in that it merely licenses EFF Manufactory to have access to Quick Fitting's confidential information to provide "cost estimates and business proposals . . . in the hope that Quick Fitting will purchase." WF Ex. 11 at 1. Nevertheless, collectively, the "valid transaction or relationship" embodied in these Agreements gives rise to significant and legitimate protectable interests. Thus, Quick Fitting certainly has an interest in protecting itself from competition facilitated by use of the information it provided to the Wai Feng parties; similarly, Quick Fitting has a legitimate interest in ensuring that its customers are not stolen by a supplier who cuts it out, particularly by using its information (whether confidential or not) to sell to the customer directly. In his 30(b)(6) deposition, Crompton identified this as key to what he considered to be Quick Fitting's legitimate protectable interest:

> If you just run a clean line – if you want to go off and build your own push fit business . . . and do it on your own, be my guest. Go invest in it, do whatever you want . . . . If you want to compete with us, that's okay, too. But if you want to do business with us, don't try to go around us.

WF Ex. 8 at 29-30.

Importantly, the non-compete restrictions that the Wai Feng parties have <u>not</u> challenged are precisely tailored to protect these legitimate interests in that they ban the sale of push-fit manufactured with any information acquired from Quick Fitting (whether or not proprietary) to any entity other than Quick Fitting, they ban the use of Quick Fitting's information (whether or not proprietary) except to manufacture for sale to Quick Fitting, and they ban the use of Quick Fitting's proprietary information to compete with, defame or cause damage to Quick Fitting. WF Ex. 4 at 1 & ¶¶ 3, 6; WF Ex. 11 ¶ 4.1. Thus, the core interest identified by Crompton is already served by the unchallenged clauses in that they contractually bar the Wai Feng parties from ever using Quick Fitting's information (whether or not proprietary) to go around Quick Fitting and sell directly to its customers or to compete with Quick Fitting, at the same time that they do not bar the Wai Feng parties from competing in push-fit based on designs, manufacturing methods, suppliers and customers developed without using any Quick Fitting information.

The challenged clauses in the 2010 License/Supply Agreement are very different from the unchallenged ones. Worldwide in reach and temporally unlimited, the first of the two bans the Wai Feng parties from ever making or selling any push-fit – even if the hypothetical, future product is manufactured using information totally unrelated to the Information in which Quick Fitting has a protectable interest and is sold outside of North America. The second bans the 2010 WF Contracting parties from ever competing with Quick Fitting "in any market [it] may serve," anywhere in the world. WF Ex. 4 at 9. Similarly, the challenged non-compete in ¶ 4.3 of the 2011 License Agreement bars EFF Manufactory from ever making or selling any push-fit products anywhere in the world. Read in light of the "the conditions of [the] case," <u>Max</u>

Garelick, 250 A.2d at 357, including the protections already provided by the unchallenged clauses, the lack of geographic or temporal limitations in these clauses, coupled with the utter lack of any "limitations keyed to uniqueness, trade secrets, confidentiality or even competitive unfairness," Columbia Ribbon & Carbon Mfg. Co., 369 N.E.2d at 6, renders the challenged clauses little more than a naked restraint on competition. Durapin, 559 A.2d at 1057; see Home Gas, 691 F. Supp. at 573-74 (solely "anti-competitive purpose" in restrictive covenant is not proper). As the court held in Columbia Ribbon & Carbon Mfg. Co., "[t]his [they] may not do." 369 N.E.2d at 6.

Base on the foregoing, I find that the challenged non-competition clauses in the 2010 License/Supply Agreement and the 2011 License Agreement are not "ancillary to an otherwise valid transaction or relationship," and that they "extend beyond what is apparently necessary for the protection of those in whose favor it runs." Cranston Print Works Co., 848 A.2d at 219-20. Accordingly, I recommend that the Court hold that all three are unenforceable as written. See id.; Durapin, 559 A.2d at 1057-58.

One loose end remains: whether, guided by Durapin, the Court should find that these clauses can or should be equitably modified to what is necessary to protect Quick Fitting's legitimate interests. Since the Rhode Island Supreme Court abrogated the so-called "blue pencil" rule, it has consistently held that such modification is an equity-based job for the trial judge. Cranston Print Works Co., 848 A.2d at 221 ("hearing justice to decide on remand" with "a free hand to take a 'blue pencil,' if necessary, to draw in any reasonable limitations on such covenants that it concludes are overbroad"); Durapin, 559 A.2d at 1059 ("court" to use equitable power to modify covenant to what "is reasonably necessary to protect a promisee's legitimate interests"). For the restrictive clause in the 2011 License Agreement, the answer is easy – the

Agreement contractually prohibits equitable modification, mandating that any unenforceable clause shall be "deemed to be severed from the Agreement." WF Ex. 11 ¶ 5.21. As to the 2010 License/Supply Agreement, animated by the sufficiency of the protective force of the unchallenged restrictive covenants, I do not recommend equitable modification because it is not necessary.[30] The unchallenged non-compete clauses already fully protect Quick Fitting's legitimate interests in preventing what they allege is the Wai Feng parties' wrongful conduct. Accordingly, there is no need for the Court to use equitable power to modify. Durapin, Inc., 559 A.2d at 1059 (unless promisor has jeopardized proprietary rights protected by challenged clause, "there is no need for the court to exercise its equity powers to modify and enforce an unreasonable noncompetition provision").

Based on the foregoing, I recommend that the Court grant summary judgment in favor of the Wai Feng parties with respect to the challenged non-compete clauses in the 2010 License/ Supply Agreement and the 2011 License Agreement, finding that all of them are unenforceable as a matter of law.

### 3.  Non-solicitation/Confidentiality Clauses

The challenged non-solicitation/confidentiality clauses appear in all three Agreements. Like the non-compete clauses, the challenged clauses supplement confidentiality and non-solicitation clauses that the Wai Feng parties have not challenged.

---

[30] The Court observes that, in the extensive briefing of this motion, Quick Fitting dedicated hardly more than one sentence to the so-called "blue-pencil" rule and did not argue for equitable modification. ECF No. 193 at 22-23. Therefore, if the Court were inclined to consider equitable modification, I alternatively recommend that it stay its equitable hand because of Quick Fitting's waiver of the issue. Vargas-Colon v. Fundacion Damas, Inc., 864 F.3d 14, 24 (1st Cir. 2017) (argument not developed in brief need not be considered); see Landrau–Romero v. Banco Popular De Puerto Rico, 212 F.3d 607, 612 (1st Cir. 2000) (holding that by failing to sufficiently raise an argument at summary judgment, party has waived it); Fed. Energy Regulatory Comm'n v. Silkman, 177 F. Supp. 3d 683, 696 (D. Mass. 2016) ("[I]ssues which are not raised at an appropriate time may be deemed waived by the reviewing tribunal.").

The unchallenged clauses may be briefly summarized. First, the 2010 License/Supply Agreement protects the Information that Quick Fitting "designate[s] in writing as being proprietary and confidential," WF Ex. 4 ¶ 3, by barring the 2010 WF Contracting parties from disclosing the confidential portion of the Information to any third party, id., while after termination of the Agreement, the 2010 WF Contracting parties are forever barred from using any of the Information. Id. ¶ 3, 6. Similarly, the 2011 NDA includes strict prohibitions on use and disclosure of Quick Fitting's "trade secret, confidential and proprietary information." WF Ex. 9 ¶ I(A, C, 1(a-g)). And the 2011 License Agreement has an entire section devoted to the protection of confidential information, which bars EFF Manufactory from using Quick Fitting's confidential information except as contemplated by the Agreement and requires EFF Manufactory to safeguard and maintain the information's confidential nature. WF Ex. 11 at 1-2.

The challenged clause in Schedule 2 of the 2010 License/Supply Agreement provides:

> [2010 WF Contracting parties] may never contact either directly or indirectly, any
> customer or potential customer of [Quick Fitting] whether indicated below, or
> unknown to [the 2010 WF Contracting Parties] for any purpose.

WF Ex. 4 at 9. No customers or potential customers are "indicated below." This clause bars the 2010 WF Contracting parties from ever having contact with any customer or potential customer of Quick Fitting, whether or not the entity is known to have a prospective or existing relationship with Quick Fitting. Id. The clause persists in perpetuity and has no limits either as to topic of the contact or the geographic venue of the other party. The challenged non-solicitation clause in ¶ I(1)(h) of the 2011 NDA is broader:

> [EFF LLC] may never contact, communicate or negotiate with any competitor,
> supplier, customer or prospect of Quick Fitting Inc, which readily known, has been
> disclosed by Quick Fitting or made known to [EFF LLC] by any communication
> from Quick Fitting. . . . Further, [EFF LLC] is required to keep all customer,
> prospect and supplier information secret at all times and may not communicate

with, or provide information to, any third party without the written agreement from Quick Fitting.

WF Ex. 9 ¶ I(1)(h).  This clause forever bars EFF LLC (or whatever entity may be the counter-party) from ever having any contact or communication with "any competitor, supplier, customer or prospect" of Quick Fitting.  Finally, the challenged non-solicitation clause in the 2011 License Agreement appears in ¶ 4.4; it provides:

> In addition to the <u>permanent</u> prohibitions against using Quick Fitting's Confidential Information Supplier shall not, during the term of this Agreement <u>and for a period of thirty-sixty [sic] (36) months after the termination of this Agreement</u>, contact, communicate with, or negotiate or conduct business with any customer or prospective customer of Quick Fitting or any Representative of such customer or prospective customer (a "Prohibited Party"), or with any person or entity that Supplier or any of its Representatives knows or reasonably should know is a customer or prospective customer of Quick Fitting, regardless of the geographic location of such Prohibited Party or its business.

WF Ex. 11 ¶ 4.4 (emphasis in original).  This three-year ban on any communication or even contact between EFF Manufactory and any customer or prospective customer of Quick Fitting is without any limit either as to the topic of the communication or as to the geographic location of the other party to the communication.  <u>Id.</u>

All three of the challenged non-solicitation clauses are ostensibly breached by a mere contact between any of the Wai Feng parties with any entity that Quick Fitting considers to be its prospective customer, competitor or supplier, without regard to (1) the topic of the contact, (2) who initiates the contact and (3) the geographic location of the other party to the contact.  Two of the three Agreements (the 2010 License/Supply and 2011 License Agreements) can be breached even though the Wai Feng parties do not know what entities Quick Fitting considers to be covered by the prohibition.  Two of the three clauses use the term "never," making clear that there is no time limit on either clause.  And although the 2011 License Agreement clause persists

for three years following the termination of the Agreement,[31] Quick Fitting has proffered no evidence to buttress its need for three years of such extraordinary protection.

Quick Fitting's legitimate interests in protecting its confidential information and in preventing the Wai Feng parties from selling Quick Fitting's push-fit products to its known customers are already protected by the unchallenged restrictive clauses. Accordingly, I find none of the challenged restraints is reasonably necessary for the protection of those interests. Cranston Print Works Co., 848 A.2d at 219-20; Durapin, 559 A.2d at 1053. Further, these clauses are so draconian that they effectively bar the Wai Feng parties from competing in any aspect of the plumbing industry because they are barred even from contacting their own customers. I find that the clauses are hopelessly overbroad, contrary to public policy and unenforceable as drafted. Cranston Print Works Co., 848 A.2d at 219-20. I therefore recommend that the Court grant summary judgment in favor of the Wai Feng parties as to each of them as written.[32]

## IV.     MOTION FOR SUMMARY JUDGMENT CHALLENGING SUFFICIENCY OF EVIDENCE OF BREACH OF ENFORCEABLE PROVISIONS IN AGREEMENTS

### A.     Factual Background Related to Evidence of Breach

During the lengthy discovery period permitted in these cases, Quick Fitting was able to uncover evidence from which a fact finder could infer that Andrew Yung, acting on behalf of some of the Wai Feng parties, including EFF Manufactory, Wai Feng Trading and EFF Inc., and potentially in concert with Cixi Welday, was eager to, and actively tried to, leverage the

---

[31] Under the Wai Feng parties' theory of termination, the 2011 License Agreement ended in December 2015. See ECF No. 223 at 5-6.

[32] In light of the mandate in the 2011 License Agreement that unenforceable clauses must be severed (WF Ex. 11 ¶ 5.21) and because Quick Fitting's legitimate interests are well protected by the unchallenged clauses, I find equitable modification is not necessary and do not recommend it.

relationship developed with Quick Fitting, including EFF Manufactory's ability to manufacture push-fit acceptable to Quick Fitting's downstream customers (such as Lowe's), in order to develop and sell a different (non-Quick Fitting) push-fit product line once the relationship with Quick Fitting ended. For example, Andrew Yung used a sample of an item EFF Manufactory had made for Quick Fitting in a late 2012/2013 attempt to sell push-fit to Watts Water Technologies, Inc. ("Watts"); the discussion included requests for quotes by reference to the actual items EFF Manufactory had been making for Quick Fitting, although both Watts and Andrew Yung claim that the focus was on Watts placing orders for a push-fit product still to be developed.[33] Similarly, in 2013, there were discussions with the Bow Group ("Bow") about the possibility of developing a push-fit product line.[34] The evidence also fairly permits the inference that the wily buyer from Quick Fitting's important customer, Mueller (through which Quick Fitting's products were sold to Lowe's), initiated indirect communications with Andrew Yung and EFF Manufactory, which Mueller used against Quick Fitting to avoid a price increase.[35]

---

[33] Watts had been a ten-year-long customer of the Wai Feng parties when the push-fit discussions in issue began in October 2012 (months after the termination of the Quick Fitting relationship). WF Ex. 18 at 2-3. The evidence establishes that, over several months in 2013, Watts solicited EFF Manufactory for quotes on what Watts described either as "quick fit fittings" or by reference to Quick Fitting product names or numbers. QF Exs. # 3 UU, VV, WW. Andrew Yung brought a sample push-fit item to a meeting with Watts, which had been manufactured for Quick Fitting. QF Ex. # 3 WW at 28-31. The participants in these discussions claim they were focused on a plastic push-fit design to be developed on Watts's specifications and designs. WF Ex. 18 at 6-7. Watts never proceeded with the business. Id.

[34] In 2013, well after the Quick Fitting/Wai Feng parties' relationship ended, John Biduk, a representative of the Bow Group visited a facility of the Wai Feng parties and spoke with Andrew Yung, who "volunteered" that he was "in the process of developing a product line" of metal push-fit plumbing products. QF Ex. #3 AAA at 3. Biduk told Andrew that Bow would be interested once the products were ready – "call me when you have all your ducks lined up." Id. at 4. Biduk also visited Bow's existing supplier, Cixi Welday; he testified to a hearsay statement that Cixi Welday and EFF Manufactory were collaborating on development of a push-fit product line. Id. at 4. The Bow Group never placed any orders with the Wai Feng parties. Id. at 13.

[35] Paul Bell, the Mueller buyer, testified that after contracting to purchase Chinese-manufactured push-fit from Quick Fitting, Mueller was able to land the mega-retailer, Lowe's, as a customer. QF Ex. #3 OO at 12-13. In 2011, Bell and his Chinese assistant, Lisia Wang, toured China. One of the stops Wang arranged was at EFF Manufactory, where Bell observed the manufacturing of Quick Fitting push-fit to be sold to Mueller. Because Bell was "in the process of building a relationship and business with Quick Fitting[,]" he talked with Andrew Yung about the product. Id. at 31. According to Bell, Andrew was "very proud of the fact that he was making the Quick Fitting

The fair implication from these facts is not that Andrew was proposing to sell the same push-fit products that EFF Manufactory was already making with Quick Fitting's confidential drawings and know-how, but rather that he was a seeking a new customer for whom a new push-fit product would be developed. The evidence further suggests that, in the six and a half years since the Quick Fitting relationship ended, these efforts have not come to fruition – perhaps because of a pull-back due to the pendency of this case, perhaps because no customer was willing to commit to placing an order, the Wai Feng parties, whether acting alone or in a venture with Cixi Welday, have not actually sold any push-fit, including in the North American market in which Quick Fitting competes. Confirming this proposition is the reality that the evidence establishes only efforts to launch a push-fit product line in 2013 and 2014; since then, nothing. That is, Quick Fitting has not presented a scintilla of proof of any efforts to sell push fit since 2014; nor has it presented any proof of actual sales of push-fit products at any time, in North America, or anywhere else in the world, by any of the Wai Feng parties or by Cixi Welday. But see QF Ex. # 3 OO at 53-61.[36]

---

product" and acknowledged that EFF Manufactory was "under contract, that they were in a, a contract with [Quick Fitting]." Id. at 31-33. While Bell wondered if EFF Manufactory would sell push-fit to Mueller directly, he knew Quick Fitting "was protected, and from either a legal standpoint . . . [Crompton's] product was protected from either a, a legal side, a contract, or patent protection," in addition to the exclusivity restrictions in Mueller's own three-year agreement with Quick Fitting. Id. "[B]ecause [he] did not want to be obvious," id. at 32, Bell had Mueller's attorneys investigate Quick Fitting's patents "to understand if we could get around them if we were so inclined," id. at 46, and he asked Wang to get pricing information and find out if EFF Manufactory would sell directly. Id. at 31-33, 38 & 72-73. His actual goal was to explore getting lower prices, "price test[ing]," which he did "all the time." Id. at 73. He never communicated directly with Andrew Yung or with any of the Wai Feng parties regarding this inquiry. Id. at 87. Rather, all communication (if there was any) was through a non-testifying declarant (Wang); Quick Fitting and the Wai Feng parties have submitted inconsistent hearsay declarations regarding Wang's account of the facts. Compare QF Ex. # 3 OO at 39-44, with WF Ex. 16. Ultimately, Bell testified that he received a price list; based on his review of whatever it really was, he was satisfied that the prices Mueller was being charged by Quick Fitting were "reasonable." Id. at 47, 83, 98. Mueller continued to buy push-fit from Quick Fitting at increasing volumes, although Quick Fitting claims it was not able to increase Mueller's prices. ECF No. 206-7 at 4-5; QF Ex. # 3 OO at 69-70, 97; Crompton Aff. # 2 ¶¶ 23-24.

[36] The closest to an actual sale occurred in July 2012, just as the Wai Fang parties' relationship with Quick Fitting was ending. Mueller's Bell testified about a chart (QF Ex. # 3 PP) prepared at Mueller analyzing pricing for PEX products (which are not push-fit) from several suppliers, including EFF Manufactory. QF Ex. # 3 OO at 52-53. Bell did not prepare the chart and did not know the source of the pricing information in it. Although the focus of the

Quick Fitting argues that a fact finder might also draw far more sinister inferences from this evidence. For example, it relies on the Wang hearsay to draw the inference that the Wai Feng parties used their access to its confidential drawing and other secrets to try to cut it out and sell directly to Mueller Industries, although the effort, if it happened, amounted to nothing.[37] Quick Fitting also seeks to show that its confidential drawings and know-how have been redeployed in a venture with Cixi Welday, the Chinese manufacturer owned by Andrew Yung's cousin, which is now poised to enter the push-fit market.[38] Similarly, it claims that its evidence would permit a fact finder to conclude that CCWFBV was manufacturing push-fit for it early in the relationship with the Wai Feng parties,[39] that CCWFBV thus came into possession of its confidential drawings, and that CCWFBV has offered push-fit for sale on Alibaba (based on an

chart was PEX, two of the items (of over 150) for which a price is shown for EFF Manufactory were push-fit products of the type sold to Mueller by Quick Fitting, although Bell insisted he considered them to be "tied specifically to the PEX program, . . . not tied to a push-fit program." Id. at 53. The evidence does not reveal whether either of the two items was actually sold to Mueller.

[37] See n.35 supra. According to Crompton, sometime in 2012, he received a call from Mueller's Bell, who told him, "[w]e have pricing from one of your factories and they're claiming they can sell us directly [sic], they're not impeded by any contract or agreement." ECF No. 206-7 at 4. Bell told Crompton he had gotten pricing proposals to sell directly not only from EFF Manufactory, but also from two of Quick Fitting's other Chinese suppliers (Xxat and Jinquan). Id. at 3. To salvage the Mueller relationship, Quick Fitting executives traveled to Mueller, apparently in 2013. Crompton Aff. # 2 ¶ 22; QF Ex. # 3 SS; see QF Ex. # 3 OO at 82-83. Quick Fitting retained Mueller as a customer and increased the volume of the business. QF Ex. # 3 OO at 69-70. Notably, Quick Fitting ended up in litigation with all three of the Chinese suppliers accused by Bell. See n.17 supra.

[38] Quick Fitting claims that Cixi Welday was provided with push-fit drawings in order to manufacture plastic components for the finished products sold to Quick Fitting. Crompton Aff. # 2 ¶¶ 26-27; QF Ex. # 3 W at 33-35. Such an arrangement appears to have been contemplated by the 2011 License Agreement. WF Ex. 11 ¶¶ 1.5, 2.2. Nevertheless, Quick Fitting now argues that it constitutes a breach. For a later period, in 2013, there is testimony that the Wai Feng parties and Cixi Welday were collaborating to develop a line of push-fit products. See n.34 supra; QF Ex. # 3 AAA at 4. Later still, in 2014, Crompton saw Andrew Yung at the Cixi Welday trade show booth where there were push-fit samples on display, as well as a product sheet with photographs of push fit products. Crompton Aff. # 2 ¶ 28; QF Ex. # 3 NN. Relatedly, Quick Fitting proffers the expert opinion of its Vice President of Engineering, Libardo Ochoa, who claims he examined two unauthenticated items – a photograph and a drawing – ostensibly submitted in 2013 by Cixi Welday for certification of two push-fit products. Ochoa Aff. ¶¶ 7-9. The Wai Feng parties have moved both to strike the Ochoa Affidavit incorporating this opinion and to exclude the Ochoa expert opinion. ECF Nos. 182 & 205. The motions are under advisement.

[39] Quick Fitting has proffered circumstantial evidence that CCWFBV was the manufacturer. In their briefs, the Wai Feng parties argue persuasively that every such fragment is readily explained away. At bottom, the best evidence of the charge that CCWFBV was the manufacturer for the first year of the relationship is the slim reed of its naming in the 2010 License/Supply Agreement that Andrew Yung signed.

unauthenticated screen shot of the Alibaba website) – all of which permits the inference that CCWFBV used Quick Fitting's confidential information.[40]

For their part, the Wai Feng parties deny that they have ever disclosed Quick Fitting's confidential information to any other company, including CCWFBV and Cixi Welday (except as authorized to manufacture components for Quick Fitting); they deny that they have ever sold products manufactured using Quick Fitting's technology to any other company; they deny that they have manufactured or distributed push-fit products for any company other than Quick Fitting; and they deny that the prices EFF Manufactory charged Quick Fitting were protected confidential information prohibited from disclosure to Mueller. WF SUF # 1 ¶¶ 23, 24, 28, 83-84. Pointing to Crompton's Fed. R. Civ. P. 30(b)(6) testimony, the Wai Feng parties contend that Quick Fitting is bound by his admission that it has no facts that prove or permit the inference that the Wai Feng parties wrongly provided Cixi Welday or CCWFBV with Quick Fitting's proprietary information or that the Wai Feng parties transferred Quick Fitting's protected information to any entity that used it to make and sell push-fit products.

The Wai Feng parties ask the Court to find that, with no evidence of any push-fit sales, Quick Fitting has failed to produce any evidence that it has been damaged, which is a mandatory element of its breach of contract claims. Id. ¶¶ 41-44, 46-51. At bottom, they ask the Court to scrutinize Quick Fitting's mountain of evidence and to conclude that it fails to "present[] a sufficient disagreement to require submission to a jury or [that] it is so one-sided that [they] must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

---

[40] The evidence of push-fit sales over Alibaba either by CCWFBV or the Wai Feng parties is less than paper-thin. Quick Fitting proffers an unauthenticated screen shot purportedly showing CCWFBV offering push-fit for sale through the Alibaba website. QF Ex. # 3 QQQ. It also relies on a set of unauthenticated inquiries sent in 2014 through the Alibaba website to the Wai Feng parties from various locations in the world (e.g., India, Zimbabwe) asking for quotes on push-fit products. QF Ex. # 3 BBB. After being pressed at the hearing about these exhibits, Quick Fitting conceded in its post-hearing brief that they prove nothing beyond "context and background to Mr. Crompton's state of mind." ECF No. 228 at 7.

**B.      Law and Analysis of Sufficiency of Evidence of Breach**

Before turning to whether Quick Fitting's factual proffer is sufficient to permit a fact

finder to conclude that the Wai Feng parties breached any of the unchallenged restrictive clauses

in the three Agreements, I pause briefly for a reprise of what the unchallenged clauses provide.

First is the 2010 License/Supply Agreement's ban on the 2010 WF Contracting parties selling

push-fit products manufactured using information provided by Quick Fitting (whether or not

proprietary) to any entity except Quick Fitting, WF Ex. 4 at 1 & ¶ 3, and the requirement that,

after termination of the Agreement, all use of Quick Fitting's information (whether or not

proprietary) must cease, with Quick Fitting retaining the right to purchase any remaining

inventory and with the residual right to freely sell off what is left vested in the 2010 WF

Contracting parties.  Id. ¶ 6.  The 2011 NDA provides that Quick Fitting's intellectual property

may not be used "to compete, advertise, manufacturer, sell, distribute, import or export Quick

Fitting's proprietary information or a similar product; without the expressed written permission

of Quick Fitting Inc[,]" WF Ex. 9 ¶ I(1)(d), and that Quick Fitting's "proprietary information

may not be used to compete with, defame or cause damage to Quick Fitting Inc."  Id. ¶ I (1)(h).

Similarly, ¶ 4.1 of the 2011 License Agreement bars EFF Manufactory, during the term of the

Agreement, from using Quick Fitting's confidential and proprietary information and trade secrets

to "compete with, defame, hinder, or cause harm to Quick Fitting."  WF Ex. 11 ¶ 4.1.

To make out a viable claim for breach of these contractual restrictions, Quick Fitting, as

the party alleging the breach, bears the burden of proving the amount of damages it has suffered

with a reasonable degree of certainty.  Toray, 958 F. Supp. 2d at 325.  The Court should not deny

recovery because damages are difficult to ascertain, as long as they can be proven with

reasonable certainty.  Id.; see Wurman v. Hodosh, C.A. No. CV 16-202 WES, 2018 WL

3254475, at *3 (D.R.I. May 17, 2018) ("In Rhode Island, . . . breach-of-contract . . . claims

require – as a threshold element – sufficiently certain damages."). To save a case from summary judgment, the claimant must advance a model or "a formula by which to compute . . . damages" to be presented to the jury. Fogarty v. Palumbo, 163 A.3d 526, 538 (R.I. 2017). However, the law of Rhode Island also recognizes that nominal damages may be awarded to a party who can prove breach – but not damages – with sufficient certainty. A.J. Amer Agency, 2014 WL 3496964, at *34 ("[An] unexcused failure to perform a contract is a legal wrong. An action will therefore lie for the breach although it causes no injury. Nominal damages may then be awarded.") (citing 4 Williston on Contracts § 64:6 (4th ed. 2014)); Nestle Food Co. v. Miller, 836 F. Supp. 69, 78 (D.R.I. 1993) (nominal damages for breach of non-compete may be recovered if link to lost business is speculative); see Acuity Brands, Inc. v. Bickley, Civil Action No. 13-366-DLB-REW, 2017 WL 1426800, at *16-19 (E.D. Ky. Mar. 31, 2017) (summary judgment denied for breach of non-compete despite no proof of actual damages because nominal damages are available); but see O'Coin v. Woonsocket Inst. Tr. Co., 535 A.2d 1263, 1266 (R.I. 1988) (when action sounds in contract, nominal damages do not lie, absent egregious circumstances).

Despite years of aggressive discovery, Quick Fitting has failed to prove that the Wai Feng parties have ever sold a push-fit product – whether or not the item included Quick Fitting's intellectual property – to any entity other than Quick Fitting itself. This proof deficit is the more significant in light of Crompton's acknowledgement, during his 2015 Fed. R. Civ. P. 30(b)(6) depositions, that, to establish that Quick Fitting's proprietary information was improperly used, it would be "necessary to examine the . . . products to confirm that they're based on Quick Fitting Technology." WF Ex. 8 at 13; see WF Ex. 17 at 15-16 (Quick Fitting has not "concluded that . . . [Cixi] Welday push fit products are based on Quick Fitting's designs or specifications" because

it does not yet "have samples" of such product being sold). Yet, when discovery closed two years after Crompton gave that testimony, as far as the summary judgment record reveals, Quick Fitting failed to uncover any such evidence. What it instead found is a series of incidents fraught with fact issues, albeit not with significant (or perhaps any) damages.

The incident with the most (relatively speaking) damage heft involves Quick Fitting's good customer, Mueller; it occurred in 2011, before the relationship between the Wai Feng parties and Quick Fitting began to sour; and it relies heavily on Wang's purported information. With no testimony from Wang regarding whom she really talked to, what was really said, what she really gave Bell and from whom she really got it, the obvious inference compelled by this incident is that a wily buyer (Bell) plotted to get enough information about the prices charged by Quick Fitting's Chinese suppliers to achieve Mueller's goal of preventing Quick Fitting from increasing the prices it was charging Mueller.

However, other inferences are also permissible. For example, a reasonable jury could find that someone from the Wai Feng parties provided Mueller with enough information regarding the prices they were charging Quick Fitting to allow Mueller to analyze Quick Fitting's costs and that the parties had agreed that such pricing information was confidential under the 2011 License Agreement,[41] so that disclosure to Mueller breached an enforceable duty of non-disclosure. It is also possible that a jury could find that the Wai Feng parties responded to Mueller's overture by proposing to cut out Quick Fitting and sell its push-fit products to Mueller directly. Such a finding would amount to a serious – though feckless in that Mueller did not bite

---

[41] The 2011 License Agreement is ambiguous regarding whether the price Quick Fitting was charged by the Wai Feng parties was confidential. Compare WF Ex. 11 ¶ 1.3 ("Confidential Information" includes "costs, and financial information," as well as customer "payment information"; prices charged by Wai Feng parties not expressly mentioned), with id. ¶ 1.4 ("Confidential Information" does not include information "developed" by EFF Manufactory).

– breach of all three Agreements that cuts to the core of Quick Fitting's protectable and legitimate interest in preventing its suppliers from using its intellectual property to steal its customers. However, without Wang's testimony to fill the proof gap,[42] it is difficult to see how Quick Fitting will prove that the Wai Feng parties really made an offer to sell, which they vehemently deny; nor is this proposition credible when examined in light of Bell's testimony that Andrew Yung told Bell that the Wai Feng parties were under contract with Quick Fitting.[43] Nevertheless, when the hearsay is ignored, Quick Fitting still has non-speculative (albeit *de minimis*) evidence of damages arising from this incident based on the expenses associated with a trip to Mueller to smooth over the relationship in February 2013. Crompton Aff. # 2 ¶ 22; QF Ex. # 3 SS.

The other Mueller incident occurred in July 2012 as the parties' relationship was crumbling. Quick Fitting has evidence that the Wai Feng parties allegedly included two push-fit items on the tail end of a proposal that they supposedly sent to Mueller with prices for over one hundred PEX items. Mueller's Bell testified that the two pieces were items Mueller was buying from Quick Fitting, but also stated, "[t]hese all represent PEX, traditional PEX products." QF Ex. # 3 OO at 60-61; see id. at 53 ("This is tied specifically to the PEX program, not speci-, not tied to a push-fit program."). As with the 2011 alleged solicitation, Mueller did not place an order for push-fit (or PEX) with the Wai Feng parties, so Quick Fitting has no lost profits, nor has it proffered any other actual damage evidence other than, arguably, the 2013 Mueller trip to

---

[42] This is not a case where Wang's hearsay declaration that Andrew Yung said the Wai Feng parties would sell to Mueller directly, as described by Bell, has indicia of trustworthiness sufficient to meet Fed. R. Evid. 807, particularly where it is contradicted by Wang's other hearsay declaration, WF Ex. 16, and is inconsistent with the admissible declarations of Andrew Yung described by Bell. QF Ex. # 3 OO at 31-33 ("[Andrew Yung] was very proud of the fact that he was making push-fit for Quick Fitting."); id. at 33 ("that [the Wai Feng parties] were a partner with Quick Fitting, that they were under contract").

[43] See n.35 *supra*.

repair the relationship.  Nevertheless, a jury could find that the Wai Feng parties solicited Mueller to purchase two push-fit items in July 2012 and that the timing permits the inference that these were products made using Quick Fitting's know-how.  The lack of actual damages is not fatal because nominal damages are available as a remedy.

Also sufficient to proceed is the allegation that in 2013 and 2014, the Wai Feng parties began a collaboration with Cixi Welday to develop a line of push-fit products using Quick Fitting's confidential drawings.  Even if the Court excludes the troublesome Ochoa affidavit, see Ochoa Aff., Quick Fitting's admissible evidence is enough for this allegation to be trial-worthy.[44]  As for damages, despite the lack of evidence of any sales by Cixi Welday, Quick Fitting may contend that the loss of control over its intellectual property inflicts an unquantifiable loss for which nominal damages are available.  See Acuity Brands, Inc., 2017 WL 1426800, at *17-18 (nominal damages recoverable for breach of non-compete with only attenuated evidence of loss).

The final incident that has enough heft to be presented to a fact finder involves Watts.  A jury could draw the inference that Quick Fitting's confidential information was being used in the Wai Feng parties' 2012-2013 sales effort with Watts based on the terminology used in the email communications, despite the failure of the Watts witness to so testify.  Relatedly, the Wai Feng parties' admission that they used a left-over Quick Fitting push-fit item as a sample during the sales pitch raises a fact issue on whether this was an improper disclosure or use of Quick Fitting's intellectual property.  As with its other claims, Quick Fitting's apparent inability to

---

[44] This evidence includes Cixi Welday's pre-2013 lack of experience in metal manufacturing, the close relationship between Cixi Welday's principal and Andrew Yung, Cixi Welday's involvement with supplying components for the Quick Fitting push-fit products manufactured by EFF Manufactory and the timing of the announcement of a venture for Cixi Welday to offer metal push-fit.

show actual damage from the sales pitch made to Watts does not remove the right to recover nominal damages.

Rule 56 requires the Court to look at issues through a broad lens and accept legitimate inferences that a reasonable juror might draw from the totality of the evidence. Viewed through that lens, I find that there is enough here for these claims to survive summary judgment and recommend that the motion be denied to the extent that it challenges the sufficiency of the evidence of breach.[45]

## V. MOTION FOR SUMMARY JUDGMENT CHALLENGING JOINDER OF EFF LLC IN 13-56

It is undisputed that the 2011 NDA named the wrong EFF entity. Instead of EFF Inc., as the Wai Feng parties claim was intended, or EFF Manufactory, as Quick Fitting's Crompton appears to suggest,[46] the 2011 NDA names EFF LLC, which is a Massachusetts company partially owned by Andrew and Jacky Yung that had almost nothing to do with the relationship with Quick Fitting, except for incidental involvement of its employees in occasional product shipments and pick-ups and performing similar errands. WF SUF # 1 ¶ 17; QF SDF # 1¶ 17. The address of the counter-party that is hand-written into the 2011 NDA is that of EFF Inc., in Canada, not EFF LLC, which is in Walpole, Massachusetts. WF SUF # 1 ¶ 16. There is no evidence that any person acting on behalf of EFF LLC was ever intended to be, or was, the

---

[45] One loose end: the Wai Feng parties have argued that the exclusivity clause in the 2010 License/Supply Agreement, WF Ex. 4 ¶ 4(c), was undisputedly breached by Quick Fitting's purchase of push-fit from other vendors and that this prior breach voided all of the contractual obligations imposed on the Wai Feng parties so that judgment should enter in their favor. Having found that this exclusivity clause is ambiguous, see n.17 supra, I do not recommend that the Court enter judgment on this basis.

[46] Crompton's second affidavit is consistent either with the Wai Feng parties' contention that EFF Inc. was intended to be the counter-party or with the proposition that the 2011 NDA was intended to name EFF Manufactory. Crompton Aff. # 2 ¶¶ 12-13. Crompton averred that he forwarded the 2011 NDA for execution to Andrew Yung because he had been told in early 2011 that a Canadian entity called "EFF" was being formed to take over the "manufacturing operations formerly handled by the 'W&F Manufacturing' factory." Id. Crompton's averments rule out EFF LLC as the proper party. QF SDF # 1 ¶ 18.

"Recipient" of trade secrets, which is required to trigger the protection of the 2011 NDA.[47]  Nor is there evidence that Quick Fitting understood that EFF LLC had the capacity to "provide estimates for the cost of specific components," which is the stated purpose of the 2011 NDA. WF Ex. 9 ¶ I(B).  Nor is there a scintilla of evidence that any actionable conduct was engaged in by any person acting on EFF LLC's behalf.  It is undisputed that EFF LLC has never sold push-fit products and has never sold anything to Quick Fitting.  WF SUF # 1 ¶¶ 148, 160.

Prior to the summary judgment phase, the Court found, and Quick Fitting acquiesced by silence to the proposition, that EFF LLC was named by mistake; nevertheless, Quick Fitting was coy about what name it understood should have been inserted.  Quick Fitting, 2015 WL 5719503, at *3 (naming of EFF LLC in 2011 NDA "appears to be wrong. . . . The Yungs say it was a mutual mistake to name [EFF LLC] when [EFF Inc.] was intended by both, while Quick Fitting does not clearly take a position on the issue.").  Now, despite its burden at summary judgment, Quick Fitting still does not argue that EFF LLC was the correct party to the 2011 NDA.  Rather, it contends that the Court should keep EFF LLC in the case because some EFF entity was a party to the 2011 NDA and a fact finder may ignore the separate corporate existence of all EFF entities, so that any EFF entity is a proper party.  Relatedly, Quick Fitting contends that EFF LLC's summary judgment motion should be denied because intellectual property sent to persons acting for EFF Manufactory, Wai Mao, Wai Feng Trading or EFF Inc. must be deemed to have been sent to EFF LLC since "the lines of distinction between Andrew Yung and

---

[47] To overcome this lack of evidence, Quick Fitting points to the inadvertent use of the EFF LLC logo on some emails from Andrew Yung and to the use of the EFF LLC name on an email from a Canadian-based employee, both involving matters related to the Quick Fitting relationship.  QF SUF # 3 ¶¶ 40-56.  However, there is no suggestion that Quick Fitting was ever lead to believe it was dealing with EFF LLC or that Andrew Yung or the Canadian-based employee were actually acting for EFF LLC.  See WF SUF # 1 ¶¶ 163, 165.

the Yung entities were essentially non-existent." 13-56 ECF No. 271 at 11. However, other than some EFF entities' employees using the same email domain name, Quick Fitting has presented nothing material to support a veil-piercing theory that the Court has already rejected.[48] See Lothrop v. N. Am. Air Charter, Inc., 95 F. Supp. 3d 90, 102 (D. Mass. 2015) (same email domain and sharing of resources and employees by corporations with common owners not enough for veil-piercing).

EFF LLC's summary judgment motion (13-56 ECF No. 257) should be granted. The Wai Feng parties persuasively assert, and Quick Fitting does not colorably dispute, that whoever handwrote EFF LLC's name in the space at the head of the 2011 NDA made a mistake. Therefore, while the fact finder could twist like a pretzel in attempting to solve the puzzle of which EFF entity was meant to be in the 2011 NDA, it is beyond cavil that the naming of EFF LLC was a mutual mistake appropriate for reformation at the summary judgment phase. OneBeacon Am. Ins. Co. v. Travelers Indem. Co. of Ill., 465 F.3d 38, 45-46 (1st Cir. 2006) (when there is "full, clear, and decisive proof of mistake," proper for court to reform contract). With EFF LLC reformed out of the 2011 NDA and finding no other basis on which a fact finder

---

[48] This Court has previously considered and declined to accept Quick Fitting's veil-piercing theory:

> Whether considering the law of Rhode Island, where "courts are loath to act like Vlad the Impaler," Doe v. Gelineau, 732 A.2d 43, 44 (R.I. 1999), or the law of Canada, China or Massachusetts, courts are universally hesitant to disregard independent corporate structure and typically require clear evidence to justify doing so. Russell v. Enter. Rent-A-Car Co. of R.I., 160 F. Supp. 2d 239, 250-51 (D.R.I. 2001). Quick Fitting has not only failed to present clear and convincing evidence, but has not even established prima facie proof of any of the markers that lead courts to ignore the separate existence of the corporate entity. Specifically, it has offered no evidence of the use of a sham entity, of undercapitalization, of the lack of corporate records, of insolvency, or of the improper use of the corporate form by dominant shareholders.

Quick Fitting, 2015 WL 5719503, at *10 (footnotes omitted). While the Wai Feng parties have reinforced the factual record establishing the separate corporate existence of EFF LLC, WF SUF # 1 ¶¶ 143-157, Quick Fitting has added nothing material to the summary judgment record to fill the hole already found by the Court. QF SDF # 1 ¶¶ 149-151, 154; see Baker v. LivaNova PLC, 210 F. Supp. 3d 642, 646 (M.D. Pa. 2016) (use of common logos and email domains not enough to pierce corporate veil). Quick Fitting's veil-piercing facts remain insufficient to meet any of Gelineau factors.

conceivably could impose liability on it, I recommend that summary judgment enter in its favor

and that it be eliminated as a defendant in the 13-56 case.

An important coda regarding EFF LLC. As the work on these motions was nearing

conclusion, the Court focused – *sua sponte* – on the undisputed facts stating that EFF LLC is

named as a limited liability company whose "owners" include an individual named Ron Roberts,

as well as that Roberts allegedly "lives" in Rhode Island. WF SUF ¶ 143; 13-56 ECF No. 135 ¶¶

29-31; see Quick Fitting, 2015 WL 5719503, at *4 ("Ronald Roberts, a Rhode Island resident").

Since Quick Fitting filed 13-56 in this Court, it has been clear that the Court's power to exercise

subject matter jurisdiction over the case is based on diversity of citizenship pursuant to 28 U.S.C.

§ 1332(a). 13-56 ECF No. 135 ¶ 57. Assuming EFF LLC is really constituted as a limited

liability company, it is well settled that its citizenship for purposes of diversity jurisdiction is

derived not from its state of incorporation, but from the citizenship of its members, who are the

owners. Pramco, LLC ex rel. CFSC Consortium, LLC v. San Juan Bay Marina, Inc., 435 F.3d

51, 54-55 (1st Cir. 2006) ("citizenship of a limited liability company is determined by the

citizenship of all of its members"). While residency in a state does not necessarily equate to

citizenship in the state for purposes of diversity jurisdiction, they often end up conflating. See

Lundquist v. Precision Valley Aviation, Inc., 946 F.2d 8, 10 (1st Cir. 1991) ("[T]he relevant

standard is 'citizenship,' *i.e.*, 'domicile,' not mere residence; a party may reside in more than one

state but can be domiciled, for diversity purposes, in only one."). Therefore, it is possible –

indeed likely – that, like Quick Fitting, EFF LLC is also a citizen of Rhode Island because one of

its members, Roberts, is a Rhode Island citizen. And if both Quick Fitting and EFF LLC are

Rhode Island citizens, then EFF LLC's joinder, which was initiated after the case had been

pending for well over a year, 13-56 ECF No. 59, requires this Court to consider whether it defeats diversity jurisdiction, requiring 13-56 to be dismissed.  Pramco, 435 F.3d at 52-54.

This state of affairs derives from an unfortunately common error.  Quick Fitting's pleading that initiated the joinder of EFF LLC in 13-56 wrongly assumed that EFF LLC's citizenship is based on its state of "incorporation"; the Wai Feng parties acquiesced in the error.  See 13-56 ECF Nos. 59 ¶¶ 34-35 & 74 ¶ 57.  When the parties make such an error, the discovery of a potentially fatal jurisdictional defect is sometimes not made until the court has plunged deeply into the facts and issues.  See, e.g., D.B. Zwirn Special Opportunities Fund, L.P. v. Mehrotra, 661 F.3d 124, 125 (1st Cir. 2011) (no inquiry about citizenship of partners of limited partnership until appeal); Pramco, 435 F.3d at 52-54 (no consideration of citizenship of members of limited liability company from initiation of action in 1999 until raised on appeal in 2005); Am. Fiber & Finishing, Inc. v. Tyco Healthcare Grp., LP, 362 F.3d 136, 138 (1st Cir. 2004) (change of party from corporation to limited partnership should have raised red flag but two years of discovery, summary judgment and appeal passed before diversity questioned); Augustyniak Ins. Grp., Inc. v. Astonish Results, L.P., CA No. 11-464S, 2013 WL 998770, at *13 n.10 (D.R.I. Mar. 13, 2013) ("The failure of parties and the district court to focus early on whether there is diversity jurisdiction is like a bad penny that keeps turning up in cases with a party that is either a limited liability company or a limited partnership.").  That is what has happened here – the Court's discovery was not made until after its work on these motions was nearing conclusion.  As a result, as of this writing, the parties have not had an opportunity to chime in on the Court's discovery.  Therefore, before the Court takes any action with respect to this jurisdictional issue, they must be afforded that opportunity.[49]

---

[49] When the discovery of this possible jurisdictional defect was made, the Court considered whether to halt work and ask the parties to brief the issue of the citizenship of EFF LLC and its impact on subject matter jurisdiction.  That

If further briefing by the parties leads the Court to determine that Roberts is a diversity-busting citizen of Rhode Island, the Court nevertheless may maintain jurisdiction over 13-56 through the mechanism in Fed. R. Civ. P. 21, which provides that "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party." "[I]t is well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time, even after judgment has been rendered." Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 832 (1989). A court may drop a dispensable and nondiverse party under Fed. R. Civ. P. 21 to cure 28 U.S.C. § 1332(a) jurisdictional defects. See Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668, 675 (1st Cir. 1994) ("[F]ederal courts of appeals have the authority – like that given to the district courts in Fed. R. Civ. P. 21 – to dismiss *dispensable*, nondiverse parties to cure defects in diversity jurisdiction.") (emphasis in original); Aurora Loan Servs., LCC v. Dream House Mortg. Corp., C.A. No. 07-00441-ML, 2009 WL 4884530, at *2 (D.R.I. Dec. 17, 2009) (citing Casas Office Machs., 42 F.3d at 675). This is consistent with the "fundamental" and "well-established" responsibility of courts to "take jurisdiction in order to determine jurisdiction." See Leroux v. Lomas & Nettleton Co., 626 F. Supp. 962, 965, n.4 (D. Mass. 1986) (rejecting argument that "absent diversity, [the] Court lacks subject matter jurisdiction over the *entire* proceeding and, therefore, it cannot properly assert jurisdiction over a *part*," namely a Fed. R. Civ. P. 41(a)(1) notice of dismissal "to cure a jurisdictional defect") (emphasis in original) (citing United States v. United Mine Workers of Am., 330 U.S. 258 (1947)).

---

option was not chosen because most of the issues covered in this report and recommendation are pending in both 13-33 and 13-56 so the resulting delay would further protract the progress of 13-33 towards trial, and because of the option to dismiss EFF LLC pursuant to Fed. R. Civ. P. 21 discussed *infra*. Instead, with the uncertainty regarding jurisdiction over 13-56 an open question, I have flagged the problem and otherwise laid out my recommendations to give the parties the opportunity to address subject matter jurisdiction in their objections or otherwise as the District Court determines is most appropriate.

Ruling on dismissal of a dispensable, nondiverse party is made by reference to the Fed. R. Civ. P. 19(b) standard – whether the action "in equity and good conscience" can fairly proceed without the party in question or whether the action "should be dismissed." Fed. R. Civ. P. 19;[50] see Hearts With Haiti, Inc. v. Kendrick, 192 F. Supp. 3d 181, 206 (D. Me. 2016) ("Rule 21 looks to Rule 19 for guidance on whether a litigant is dispensable."), aff'd, 856 F.3d 1 (1st Cir. 2017) (Souter, J., sitting by designation). In this instance, the analysis above, which leads to the conclusion that the Court should enter summary judgment in EFF LLC's favor, may be repurposed to support the conclusion that EFF LLC is a dispensable party the Court can drop to maintain jurisdiction over the case. Cf. Payroll Mgmt. Inc. v. Lexington Ins. Co., Case No. 3:10CV471/MCR/CJK, 2014 WL 12759759, at *2-3 (N.D. Fla. Dec. 29, 2014) (curing a diversity jurisdiction defect via Rule 21 dismissal of a dispensable party because it lacked "a real and substantial stake" in the case and other parties "would not be prejudiced"), aff'd, 815 F.3d 1293, 1298-99 (11th Cir. 2016) (per curiam). Dismissing EFF LLC on these grounds aligns with the Court's duty to ensure the Rules are "construed, administered, and employed . . . to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

---

[50] Rule 19(b) provides:

> [T]he court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:
> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
> (2) the extent to which any prejudice could be lessened or avoided by:
>     (A) protective provisions in the judgment;
>     (B) shaping the relief; or
>     (C) other measures;
> (3) whether a judgment rendered in the person's absence would be adequate; and
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).

Based on the foregoing, I recommend entering summary judgment in favor of EFF LLC because the undisputed facts establish that its naming in the 2011 NDA was a mutual mistake and because Quick Fitting spotlights no other trial-worthy facts undergirding a viable theory for its joinder. Alternatively, if further factual development confirms that EFF LLC is a limited liability company and that one of its members is a citizen of Rhode Island, so that its joinder destroys the Court's diversity jurisdiction over 13-56, for the same reasons, I recommend that the Court find that EFF LLC is a dispensable party in 13-56 and dismiss it pursuant to Fed. R. Civ. P. 21 to cure the jurisdictional defect.

## VI.    MOTION FOR SUMMARY JUDGMENT CHALLENGING JOINDER OF ANDREW YUNG IN 13-56

Andrew Yung is joined in his individual capacity as a party in Count IX of the 13-56 complaint; his argument that the Court lacks personal jurisdiction over him was overruled by Quick Fitting, 2015 WL 5719503, at *6-7 n.10, which held that his signature on the 2010 License/Supply Agreement extended his exposure to all of Quick Fitting's claims against him. If a fact finder credits any of Quick Fitting's factual theories as discussed above, there is ample direct and inferential evidence that Andrew Yung is the individual who was at the center of the action. Similarly, if the state law trade secret claim is credited, Andrew Yung is the actor who is pivotal. Accordingly, to the extent that Quick Fitting's claims targeting Andrew Yung survive summary judgment, as I recommend that they do, I also recommend that Andrew Yung's motion for summary judgment be denied.

## VII.    MOTION FOR SUMMARY JUDGMENT CHALLENGING OTHER CLAIMS

The final summary judgment motion addressed in this report and recommendation challenges the viability of Quick Fitting's state law tort claims, which are asserted in its 13-56

complaint as Counts II-IV and X-XI – misappropriation of trade secrets, fraud/misrepresentation, business defamation, civil conspiracy and injunctive relief.[51]  ECF No. 254.

## A.      Misappropriation of Trade Secrets

The Rhode Island Uniform Trade Secrets Act ("Trade Secrets Act" or "Act") provides for injunctive relief and recovery of money damages for the misappropriation of a trade secret disclosed or used without consent after it was acquired under circumstances giving rise to a duty to maintain secrecy or limit its use.  R.I. Gen. Laws § 6-41-1, *et seq.*  Damages can include both the actual loss caused by the misappropriation and the unjust enrichment that is not taken into account in computing actual loss.  R.I. Gen. Laws § 6-41-3.  In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty based on the misappropriator's unauthorized disclosure or use of a trade secret.  A "trade secret" is defined as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that . . . (i) [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  R.I. Gen. Laws § 6-41-1(4).

For summary judgment purposes, the Court is satisfied that, as averred by Crompton in his second affidavit, Crompton Aff. #2 ¶¶ 3-4, a fact finder could conclude that Quick Fitting's

---

[51] The Court disposes only of part of this motion in this report and recommendation.  In addition to the tort claims listed in the text, the motion also attacks the viability of Quick Fitting's claims that the push-fit products that it accepted but failed to pay for were nonconforming, defective or negligently manufactured.  That aspect of the motion will be addressed in a separate report and recommendation.  See n.7 *supra*.

confidential drawings and specifications amount to trade secrets under the Act.[52]  See Alifax

Holding SpA v. Alcor Sci., Inc., Civil Action No. 14-440 S, 2015 WL 5714727, at *3-4 (D.R.I.

Sept. 29, 2015) (under Trade Secrets Act, it is enough to allege that email messages and product

drawings were marked as confidential); Baris v. Steinlage, No. C.A. 99-1302, 2003 WL

23195568, at *23-24 (R.I. Super. Dec. 12, 2003) (trade secrets include information that does not

exist in the public domain, is subject to reasonable efforts to maintain its secrecy, and would be

economically valuable to a competitor).  Further, while the Wai Feng parties have identified

what unquestionably are serious deficiencies with Quick Fitting's Trade Secrets Act claim,[53]

there nevertheless is enough for the claim to proceed past summary judgment, particularly where

the Act contemplates the availability of injunctive relief for an "[a]ctual or threatened

misappropriation," R.I. Gen. Laws § 6-41-2(a), without regard to whether use of the

misappropriated secret caused "actual loss" or "unjust enrichment."  R.I. Gen. Laws § 6-41-3(a).

Based on the facts from which a reasonable juror could find that the Wai Feng entities

improperly allowed Quick Fitting's trade secrets to come into the possession of Cixi Welday for

the purpose of developing a metal push-fit product line, I find that there is enough for a fact

finder to grapple with this claim and recommend that summary judgment be denied on Count II

of the 13-56 complaint.

---

[52] With a record replete with references to the confidential nature of Quick Fitting's drawings and ambiguity as to whether any or all disclosed in a patent, the Wai Feng parties' argument that a patent-protected drawing is not a trade secret functions as a red herring.

[53] For example, any sharing of the trade secrets among CCWFBV, EFF Manufactory or Cixi Welday, as necessary for the purpose of manufacturing the push-fit products for sale to Quick Fitting, does not amount to misappropriation as the term is defined by the Trade Secrets Act.  R.I. Gen. Laws § 6-41-1(2).  Nor does Quick Fitting's claim that the Wai Feng parties breached their contractual duty of non-disclosure by allowing Mueller's buyer to get access to Quick Fitting's prices; the prices that the Wai Feng parties charged Quick Fitting are not a trade secret under the Trade Secrets Act because they were not "acquired" or "derived" from another entity.  R.I. Gen. Laws § 6-41-1(2)(ii)(II-III).  And even if Quick Fitting can prove that Cixi Welday really used a Quick Fitting drawing to design a product, with no evidence that such a product was ever sold, it is questionable whether there is enough for a fact finder to conclude that there has been "actual loss" or "unjust enrichment," as the Trade Secrets Act requires for recovery of damages.  R.I. Gen. Laws § 6-41-3.

### B. Fraud and Misrepresentation

To establish a *prima facie* case of common law fraud in Rhode Island, "the plaintiff must prove that the defendant 'made a false representation intending thereby to induce plaintiff to rely thereon,' and that the plaintiff justifiably relied thereon to his or her damage." A.J. Amer Agency, 2014 WL 3496964, at *14; Women's Dev. Corp. v. City of Central Falls, 764 A.2d 151, 160 (R.I. 2001) (quoting Travers v. Spidell, 682 A.2d 471, 472-73 (R.I. 1996)). Liability for fraud cannot attach unless the misrepresentation was intentionally made with intent to deceive. Fleet Nat'l Bank v. Anchor Media Television, Inc., 45 F.3d 546, 554-55 (1st Cir. 1995) (listing cases). Whether the claim is fraud or negligent misrepresentation, the plaintiff must specifically plead and prove with particularity the "time, place and content of [the] alleged false representation[.]" Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir. 1985); see North Am. Catholic Educ. Programing Found., Inc. v. Cardinale, 567 F.3d 8, 15 (1st Cir. 2009).

The common law torts involving deceit differ from a claim for breach of contract in that they impose liability on a person who "fraudulently" makes a "misrepresentation" to another who justifiably relies upon that misrepresentation and experiences "pecuniary loss[.]" Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 343-44 (2005). That is, these torts require proof of actual economic loss. Id. (citing Pasley v. Freeman, 3 T.R. 51, 65, 100 Eng. Rep. 450, 457 (1789) (if "no injury is occasioned by the lie, it is not actionable: but if it be attended with a damage, it then becomes the subject of an action")); see Shaulis v. Nordstrom, Inc., 865 F.3d 1, 15 (1st Cir. 2017) ("[U]nder Massachusetts law, a claim for fraudulent misrepresentation requires a pecuniary loss."). Critical for purposes of these cases, the plaintiff "must have suffered substantial damage," not simply nominal damages, before "the cause of action can arise." Dura Pharm., 544 U.S. at 344 (citing W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and

Keeton on Law of Torts § 110, p. 765 (5th ed. 1984)).  Rhode Island law embraces these principles.  See Becker v. Independence Bank, 305 F. Supp. 3d 351, 358 (D.R.I. 2018) (citing to the Rhode Island Supreme Court in stating "[d]etrimental reliance[ ]" is an "element[ ] a plaintiff must prove[ ]" in fraud and misrepresentation claims).  "[I]n an action for deceit based on false representations, a plaintiff must show, not only that false representations have been made by the defendant to the plaintiff, but that, acting in reliance upon such false representations the plaintiff has been injured."  Dunn & McCarthy v. Bishop, 90 A. 1073, 1073 (R.I. 1914) (per curiam) (plaintiff "not entitled to recover" because "the plaintiff's injury resulting from the defendant's deceit is entirely contingent and uncertain"); see Dow Badische Co. v. Wasserman, No. C.A. 73-175, 1976 WL 181972, at *5 (R.I. Super. Mar. 18, 1976) (citing Dunn for this proposition); see also Farmer v. Lynch, 67 A. 449, 449 (R.I. 1907) (per curiam) ("It does not appear that the plaintiff suffered any damage by reason of the deceit.  In this view the other questions become unimportant.").

To buttress its claim of a false representation, Quick Fitting relies on a hotly contested averment from Crompton: that Andrew Yung told him the manufacturing of push-fit pursuant to the 2010 License/Supply Agreement would be done at CCWFBV and that Andrew was an owner of that entity.  Crompton Aff. # 2 ¶¶ 7-8.  Quick Fitting contends that it relied on this intentionally false information in accepting Andrew Yung's signature as binding CCWFBV to the restrictive covenants incorporated into the 2010 License/Supply Agreement.  While Quick Fitting has produced no evidence to suggest that confidential information was ever sent directly to CCWFBV, WF SUF # 1 ¶¶ 42-44, it has proffered enough to create a factual dispute regarding whether any manufacturing was actually done at CCWFBV.  See n.39 *supra*.  If a fact finder concludes that some manufacturing was done at CCWFBV, it is a fair inference that Quick

Fitting's technology must have been provided to CCWFBV by someone or it could not have manufactured push-fit to Quick Fitting's specifications. Further, a reasonable juror could find detrimental reliance by Quick Fitting on Andrew Yung's intentionally false representation that he was an owner of CCWFBV in that Quick Fitting accepted Andrew's signature of the 2010 License/Supply Agreement as sufficient to bind CCWFBV to its terms.

This leads to the claim's fatal flaw – the utter lack of proof of any actual economic injury. See Dura Pharm., 544 U.S. at 343-44 ("[T]he common law has long insisted that a plaintiff in such a case show not only that had he known the truth he would not have acted *but also* that he suffered actual economic loss.") (emphasis added); Dunn, 90 A. at 1073. Quick Fitting has failed to produce even a scintilla of evidence tending to establish that its intellectual property was wrongly used or disclosed because CCWFBV was (as Quick Fitting claims) manufacturing and shipping push-fit products to it during 2010 and 2011, pursuant to an understanding, if not a binding contract. Moreover, Quick Fitting has failed to marshal even a scintilla of proof that CCWFBV ever used Quick Fitting's trade secrets so as to inflict economic injury on Quick Fitting. Based on that deficit, I recommend that summary judgment enter against Quick Fitting on Count III (fraud and misrepresentation) of its 13-56 complaint.

## C.      Defamation

Mueller's Bell authenticated a July 2012 email written by the non-testifying declarant Wang to Bell, her superior, in which she reported that Andrew Yung told her EFF Manufactory had stopped doing business with Quick Fitting because it had failed to pay for "a order worthy 500K$ [sic]" and that Andrew was initiating litigation.[54]  QF Ex. # 3 QQ at 1.  Bell testified that the information had no impact on Mueller's business with Quick Fitting.  QF Ex. # 3 OO at 69.

---

[54] The email also mentioned a similar complaint from another Chinese supplier claiming it too had not been paid by Quick Fitting.  QF Ex. # 3 QQ at 1.

Quick Fitting relies on the arguable hearsay in this email as the only evidence underpinning its state law claim of defamation.

To establish a claim for defamation, Quick Fitting must show (1) the utterance of a false and defamatory statement concerning another; (2) an unprivileged communication to a third party; (3) fault amounting to at least negligence; and (4) damages. Cullen v. Auclair, 809 A.2d 1107, 1110 (R.I. 2002) (per curiam) (quoting Nassa v. Hook-SupeRx, Inc., 790 A.2d 368, 373 n.10 (R.I. 2002)). A statement normally is not actionable unless it contains an objectively verifiable assertion. Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 127-28 (1st Cir. 1997); see Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1227 (7th Cir. 1993) ("A statement of fact is not shielded from an action for defamation by being prefaced with the words 'in my opinion,' but if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable."). "The First Amendment 'overlays' state defamation law[.]" RainSoft v. MacFarland, C.A. No. 15-432 WES, 2018 WL 4696737, at *4 (D.R.I. Sept. 30, 2018) (quoting Sindi v. El-Moslimany, 896 F.3d 1, 13 (1st Cir. 2018)). "[A]n opinion whose factual basis is expressed and (substantially) true is protected speech." Id. at *5 (citing Restatement (Second) of Torts § 566 (Am. Law Inst. 1977). "[S]tatements count as substantially true if they are, in fact, true, but too even if they admit of '[m]inor inaccuracies[,] . . . so long as the substance, the gist, the sting, of the libelous charge be justified.'" Id. at *6 (quoting Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 517 (1991)). As the plaintiff in a defamation action, Quick Fitting carries a substantial burden. Alves v. Hometown Newspapers, Inc., 857 A.2d 743, 750-51 (R.I. 2004). Quick Fitting argues that the actionable statement amounted to unspoken innuendo that Quick Fitting was on shaky financial footing.

Quick Fitting's effort founders on the first and fourth elements – the undisputed truth of the actionable portions of the utterance and the absence of damage. As memorialized in the Wang email, Andrew Yung allegedly stated that he had stopped business with Quick Fitting "as QF did not pay him for a order worthy 500k$ [sic]," he had "already started the legal process," and that Quick Fitting was critical of the Wai Feng parties' delivery and quality. QF Ex. # 3 QQ at 1; ECF No. 191-15 at 99-101. Every objectively verifiable fact in this statement is true. That is, it is undisputed that, in July 2012, the Wai Feng parties broke off their relationship with Quick Fitting based on non-payment of between $400,000 and $500,000 and were about to initiate litigation, which they did on August 2, 2012. Considering its legal claim that the Wai Feng parties delivered defective goods, Quick Fitting cannot dispute that it has been critical of the Wai Feng parties' delivery and quality. 13-56 ECF No. 135 at 45. The balance of the statement is non-actionable, amounting to Andrew Yung's opinion that he had been cooperative, but that Quick Fitting "tried all the possible way [sic] to reduce payment using all kinds of excuse[s.]" QF Ex. # 3 QQ at 1. At the same time, from other sources, Mueller also learned that other Chinese suppliers of Quick Fitting were making similar claims. Yet, Bell testified that none of this information had any impact on Mueller's business relationship with Quick Fitting. QF Ex. # 3 OO at 69.

True statements coupled with an opinion that caused no damage do not amount to actionable defamation. See RainSoft, 2018 WL 4696737, at *4-8. I recommend that the Court enter summary judgment against Quick Fitting with respect to Count IV of the 13-56 complaint.

### D. Civil Conspiracy

To prove a civil conspiracy, a plaintiff must show evidence of an unlawful enterprise. Read & Lundy, Inc. v. Washington Tr. Co. of Westerly, 840 A.2d 1099, 1102 (R.I. 2004). Under

Rhode Island law, civil conspiracy is not an independent basis of liability. Guilbeault v. R.J. Reynolds Tobacco Co., 84 F. Supp. 2d 263, 268-69 (D.R.I. 2000). Absent an underlying tort or predicate wrongful act, conspiracy is not recognized as an independent cause of action. Murphy v. Central Falls Det. Facility Corp., No. C.A. 14-203 S, 2015 WL 1969178, at *14 n.10 (D.R.I. Apr. 30, 2015). In order for a predicate wrongful act to result in the imposition of liability for civil conspiracy, there must be specific intent to do something illegal or tortious. Fleet Nat'l Bank v. Anchor Media Television, Inc., 831 F. Supp. 16, 45 (D.R.I. 1993), aff'd, 45 F.3d 546 (1st Cir. 1995). In light of my recommendation that summary judgment be denied as to Quick Fitting's claims arising under the Trade Secrets Act, which is premised on intentional misappropriation of trade secrets, I also recommend that summary judgment be denied with respect to the derivative civil conspiracy claim in Count X of the 13-56 complaint.

### E.   Injunctive Relief

I recommend that summary judgment be denied with respect to Quick Fitting's claim for injunctive relief in Count XI of the 13-56 complaint. As long as the breach of contract and Trade Secrets Act claims continue, the claim for injunctive relief should remain pending. See WF Ex. 4 ¶ 7(a) (injunction relief available for breach of 2010 License/Supply Agreement); WF Ex. 9 ¶ I(6) (injunction relief available for breach of 2011 NDA); WF Ex. 11 ¶ 5.10.

## VIII.   CONCLUSION

Based on the foregoing, I make the following recommendations. I recommend granting in part and denying in part the Wai Feng parties' summary judgment motion taking aim at (a) Count IV of Quick Fitting's counterclaims in 13-33, (b) Count I of Quick Fitting's operative complaint in 13-56 and (c) the sufficiency of the evidence Quick Fitting presents on those alleged breaches of contract. 13-56 ECF No. 255. I find the motion should be granted as to

aspects (a) and (b) but denied as to (c).  I further recommend that the Court deny Andrew Yung's summary judgment motion challenging Quick Fitting's Count IX in 13-56.  13-56 ECF No. 256.  I further recommend granting EFF LLC's motion for summary judgment (13-56 ECF No. 257), or, if necessary as described above, dropping EFF LLC under Fed. R. Civ. P. 21.  The final summary judgment motion addressed in this opinion is the Wai Feng parties' challenge to certain state law claims Quick Fitting advances in 13-56, which I find should be granted in part and denied in part.  13-56 ECF No. 254.  I recommend granting the motion as to fraud/misrepresentation (Count III) and defamation (Count IV) and denying it as to misappropriation of trade secrets (Count II), civil conspiracy (Count X) and injunctive relief (Count XI).

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
December 17, 2018